UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LEVONA HOLDINGS LTD., *et al.*,

Plaintiffs,

v. 26 CV 3620 (LJL)

ELETSON HOLDINGS, INC., *et al.*,

Remote Conference

Defendants.

------------------------------x

New York, N.Y.
July 2, 2026
11:00 a.m.

Before:

HON. LEWIS J. LIMAN,

District Judge

APPEARANCES

QUINN EMANUEL URQUHART & SULLIVAN LLP
Attorneys for Plaintiffs
BY: ISAAC NESSER
MICHAEL A. WITTMANN

GOULSTON & STORRS PC
Attorneys for Eletson Defendants
BY: JENNIFER B. FUREY
NATHANIEL R.B. KOSLOF

GIBSON DUNN & CRUTCHER LLP
Attorneys for Reed Smith Defendants
BY: MARSHALL ROSS KING
ANDREW FREIRE
CHRISTOPHER LEE WILSON

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO PC
Attorneys for Defendants Solomon and Weller
BY: ELKAN ABRAMOWITZ
ANNA GOODELL ADAMS
RICHARD FRANKLIN ALBERT

(The Court and all parties present remotely)

THE COURT: Good morning, everybody. My courtroom deputy has taken appearances.

So my plan is first to hear from the plaintiff, from Levona. It would be helpful for me to understand the status of this matter more generally. I've got some of the defendants appearing here, but not all of them. It would be helpful to know the status of all of the defendants and, also, how this fits in with respect to the larger dispute between the parties. And then, Mr. Nesser, I'll hear from you with respect to why the proposal that I've received from the defendants in this case, the Reed Smith defendants, is not a reasonable proposal. Then, Ms. Furey, I'll hear from you, and then after that, I'll hear from either Mr. King or Mr. Abramowitz, whoever wishes to go first.

So, Mr. Nesser, fill me in from your perspective.

MR. NESSER: Thank you, your Honor.

The status is that, of course, the complaint has been served on the Reed Smith defendants. The complaint is in the process of being served on the remaining defendants, all of whom are brought, and those defendants are the three Cypriot entities that intervened in the vacatur proceeding, and then the individual defendants who are in Greece.

I expect that that process of service will take perhaps another couple of months, but it's uncertain because of

the vague rigs of international service.

THE COURT: Mr. Nesser, is that being accomplished through the Hague? Or fill me in on how it's being accomplished and what you expect the process to be.

MR. NESSER: Yes, it's primarily being accomplished through the Hague. We have a separate -- I believe we more recently mailed a copy of the complaint to the Cypriot defendants. I believe mail service is acceptable in Cyprus, so that may be complete more quickly.

THE COURT: So with the Hague, where do you stand?

MR. NESSER: The complaint has been translated, which is required, and I think it's now in the process of being transmitted to the relevant authorities in the foreign jurisdictions.

THE COURT: Do you have any information about how long it typically takes foreign authorities to effect service after the complaint has been transmitted to them?

MR. NESSER: Yes. So, what I've been told is that in Greece, it can take three months from the date the request arrives in the country, so it's six weeks for service, and then another six weeks to get the proof of service. And then in Cyprus, it's approximately two months for service plus two months to get proof of service. But, again, Cyprus accepts mail service, and that is now in progress, so I think that will be done more quickly.

THE COURT: Okay. You may continue.

MR. NESSER: I think the other question or the next question your Honor asked is how this relates to the other proceedings or the other goings-on in these cases.

From our perspective, this case is a follow-on to the vacatur proceeding over which your Honor presided. We believe that there will be some additional discovery that needs to happen, but we believe that we have a very significant head start in dealing with that. Reed Smith has collected already millions of documents, literally they've processed and reviewed hundreds of thousands of documents over a long period of time, in multiple different contexts. And so we've had lengthy discussions about custodians, we've had lengthy discussions about search terms, we have hit reports, we have all kinds of things. And so that is a process that inevitably will take some amount of time, but we are very far from being at the start of that. We have a very significant head start in dealing with all of that. And as I think I began to say, our view is that this is a follow-on to the vacatur proceeding. So we already have a very significant amount of what we believe is necessary, and we think that what is -- the additional work, in our view, is relatively limited.

So that's the relationship, I think, with the vacatur action.

The case that Ms. Furey's firm is prosecuting in the

bankruptcy case, the adversary proceeding filed by Eletson Holdings, that case, as I understand it, Ms. Furey is on and can address it more directly, but my understanding of that proceeding is that motions to dismiss were filed and were argued and are sub judice with Judge Mastando. I don't know when Judge Mastando expects to rule on those. I believe I saw yesterday that there was a case management Rule 26(f) conference scheduled with the Court on July 30, and there has not been discovery commenced in the interim.

Again, Ms. Furey or Mr. King will let the Court know if I misstated any of that. Part of the issue — and I think this is relevant — is that none of the plaintiffs in this case is a party in that case. So Levona is not a party there, Eletson Gas is not a party there, EMC Gas is not a party there. So I am proceeding really based on what I see being posted to the docket. There were arguments made to me during the meet-and-confer process about why shouldn't certain schedules that were discussed there be applicable here. That was a strange position for me because I have no idea what schedules were discussed in that case.

So our view is that that case is a separate case. My clients in this case are not parties there. And we just don't -- I know there's been a suggestion by the Reed Smith defendants that, essentially, there should be a stay of discovery here so we can find out what's going to happen there.

We think that's not well taken, for a number of reasons.

Number one, the Reed Smith defendants have moved to dismiss that case and have moved, in the alternative, to compel arbitration. And so when we get a request to coordinate discovery here with discovery in that case, what we're being asked to do is coordinate discovery with a case that the Reed Smith defendants contend is going away, either it's going away entirely or it's going away to an arbitration. So I don't know what it would mean for your Honor to coordinate with a case that is up in the air, we don't know when discovery will open, if it will open, or how we could coordinate with it.

But --

THE COURT: So, let me ask you, Mr. Nesser, that is sub judice in front of Judge Mastando?

MR. NESSER: Yes. Yes, your Honor.

COUNSEL: I think your Honor is frozen.

MR. NESSER: I'm here still. Can you guys hear me?

COUNSEL: I think the Judge is frozen.

(Pause)

COUNSEL: Is the clerk on the line?

THE DEPUTY CLERK: Yes. Please hold on. We're having some technical difficulties.

THE COURT: Hi. This is Judge Liman again. Apologies. We had some computer problems on my end.

Where I lost you is I was asking Mr. Nesser that to

the extent that Judge Mastando issues a ruling that would permit discovery to go forward in the matter before him, and to the extent that it's not barred by a protective order before him, wouldn't it make sense for discovery in that matter to be coordinated with discovery here?

MR. NESSER: Look, if discovery opens there, and discovery opens here, for sure, we can all work together to make sure that we're being as efficient as we can be. I just don't know how that's going to shake out.

And I was going to say, your Honor, that even if discovery does not open there for a period of time, there's no reason that we can't all have in mind what will be necessary there, when and if discovery opens there, and take that into account in what we're doing here. Most of the material -- I'll say this: The Reed Smith defendants' letter to your Honor I think affirmatively said that a very significant amount of the discovery here is going to be relevant there.

And so if we do it here, and it winds up being relevant there, they can use it there, but the direct answer to your direct question is yes.

THE COURT: And the other question I had, Mr. Nesser, has to do with a matter that came up in the vacatur proceeding, which was the Reed Smith client file. Maybe you could bring me up to speed as to where things stand with that, and whether that is an issue that will come up in this matter, including

whether if there is a definitive determination with respect to privilege, it might facilitate discovery here.

MR. NESSER: Yeah. So that issue, as your Honor will recall, your Honor directed turnover of the client file, there was some proceedings in the Second Circuit in which they stayed the turnover. That's all with the Second Circuit now. I believe they're hearing all of the appeals together. So the appeal from your Honor's vacatur decision, the appeal from the bankruptcy plan, the appeal on the turnover order is all essentially being done on a consolidated basis. I think all of it is now briefed. I may be wrong about that, but we don't have an argument date. I expect that perhaps it will be argued after the summer sometime. It's unclear whether we will have a decision.

But, look, to a certain extent, I think the posture here inevitably is going to be the same posture that ultimately was obtained in the vacatur proceeding, which is it would be great if we could get an order from the Second Circuit resolving that issue in time, but it's not clear when and if that will happen. So in the absence of having any sense of how that's going to shake out, I think, for better or worse, we have no alternative -- plaintiffs' view is that we have no alternative but to proceed on the basis that's in front of us.

THE COURT: I guess I did have two more, maybe three more, questions.

The first has to do with the Rule 11 proceeding and whether you have thoughts, Mr. Nesser — and I will obviously ask the other parties — how to make sure that the discovery that is ongoing in that matter is not duplicative with discovery here or vice versa, and particularly being sensitive to the interests of the persons who are parties to this action, but who have not yet been served. So maybe you can address that, and then I'll have two more questions.

MR. NESSER: So just by way of update on discovery with regard to Rule 11: The parties have -- well, not the parties. Levona and the respondents on the Rule 11 motion have had pretty extensive meet-and-confer process regarding search terms and custodians and date ranges and so forth. All of that is now essentially resolved. There are a couple of issues that I think are ambiguous as to whether they've been resolved with respect to how privileged disputes will be addressed, but we have reached agreement regarding scope of document review and production, essentially. And the letter that we received -- I haven really received much in the way of production yet, but I understand that that's in progress.

The letter that the Reed Smith defendants filed with your Honor yesterday in this case I believe concluded by asserting that, in their view, that Rule 11 discovery process should continue independent of whatever is happening here. So there should not be a coordination of discovery as between

those two processes. And I think from the plaintiffs' perspective, that's acceptable to us.

THE COURT: Okay. I'll obviously hear from Mr. King and Mr. Abramowitz and Ms. Furey with respect to that. That would solve the issue, I suppose, with respect to the persons who have not yet been served in this action, but if in that other action, there was a proposal, I realize that Mr. King, Mr. Abramowitz made points about reputation, but if there was a proposal to make sure that the discovery was coordinated so that there was no duplicative work, particularly if there was consent on all parties, the Court would likely not stand in the way to that.

Discovery from the Cypriot entities, from everybody else who has not yet been served, Mr. Nesser?

MR. NESSER: Look, we have a long history to get discovery from the Cypriot entities, as the Court is aware. The position that they have taken consistently is that they don't really have much of anything, that they're shell entities, and they don't have their own documents and they have no control over anybody else's documents. And so it may be that -- look, when and if they appear, I expect that we will serve discovery on them, but it's not our expectation that they're going to be a repository for a very significant quantity of discovery or that therefore it will take a significant amount of time to deal with all of that.

I will add that, again, we have no idea what the Cypriot entities will do in terms of whether they appear or not. I will note, number one, we did serve the complaint -- not serve. We did deliver a copy of the complaint to multiple different lawyers who have represented the Cypriot entities in different proceedings. None of them accepted service. And that's not to say that they won't have some lawyer appear and accept service, but, to date, they have not, though they're aware of what's going on here.

And Mr. King, in his opposition to the motion to withdraw the reference, I think, took the affirmative position that their expectation is that the Cypriot entities will not appear. There is reason to believe that they will. We've had --

THE COURT: I don't really put much weight either on Mr. King's statement or, Mr. Nesser, necessarily on yours. Mr. King has a client, and it's not the Cypriot entities.

MR. NESSER: For sure.

And I don't mean to put too much weight on it. I just mean to say I think the primary point, in answer to your Honor's question, is when and if they appear, I don't believe that that's going to be a massive discovery undertaking. The primary discovery undertaking, in our view, will be, again, the follow-on work with respect to Reed Smith.

THE COURT: And then do you anticipate any other

international discovery that you might need?

MR. NESSER: You know, there may be some. We don't perceive it as being a huge issue. Really, we think that the focus here is on Reed Smith.

THE COURT: So I guess the question -- I take it you mean your focus with respect to discovery. I would think, from your complaint, that you're not indifferent to whether there's a declaratory judgment entered with respect to the Cypriot entities.

MR. NESSER: Certainly not indifferent at all. It's important to us that that be resolved, but we don't know that there's much discovery from abroad that's necessary to that. As I said at the top, we've been dealing with this for years. Your Honor has seen documents and reviewed documents and made factual findings, of course in a different case with different parties, but there may be some additional work that needs to be done that -- we asked your Honor to issue the equivalent of a declaratory judgment already in the vacatur proceeding, and we understand your Honor's ruling on that, but we don't believe there's much more that needs to be done.

THE COURT: So, Mr. Nesser --

MR. NESSER: I was going to say, I should add that on the issue of -- to the extent to which we care about declaratory judgment, there does continue to be a need to resolve the issue of who controls and owns Gas. There are at

least two ships that are at sea, I guess literally and figuratively, that are Eletson Gas ships that we believe are controlled by our clients, and the other side has taken the position that that's not the case, and so there are these at least two ships that are up in the air. We have reason to believe — though I don't want to state it too strongly — but we have reason to believe there's ongoing interactions between Reed Smith and the former owners of the Eletson entities regarding related issues. And so this is an ongoing issue that's causing -- there are disputes in Greece -- I'm sorry, in Germany, I believe, regarding some bank accounts. So this is an ongoing issue that has real-world consequences that we believe need to be resolved.

THE COURT: So I'm not indifferent to that. Given the fact that I do have a motion to dismiss pending in front of me, and given the fact that you're not going to be able to get relief as to the Cypriot entities until -- in this case until they have been served, why isn't the proposal, maybe with some tweaks, made by Mr. King and Mr. Abramowitz not a reasonable way to proceed?

MR. NESSER: May I ask which of the proposals you're referring to?

THE COURT: Well, the proposal that I have in mind - and maybe let me offer the tweaks - is that at least until the earlier of the date on which the Cypriot entities are

served or I have resolved the motion to dismiss, that I should not enter a case management plan in this action, with the caveat, perhaps, that any party could apply to me for relief from that so that discovery can be coordinated in the action before Judge Mastando and in this action so that there's not duplicative work.

MR. NESSER: So I think what I was saying is your Honor, of course, is aware -- I shouldn't even be presumptuous and say that. A stay of discovery pending a motion to dismiss in the circuit is presumptively not the approach absent a motion for a stay and a showing of good cause. I will note that they have not made a motion for a stay of discovery, and they have not attempted to argue that each of the elements of the good-cause analysis is met.

As to those issues, number one, with respect to the breadth of discovery, again, I think the breadth of discovery from the unserved defendants is pretty narrow. The breadth of discovery from the Reed Smith defendants, we think, is pretty manageable, but inevitably will take some time, and it makes sense to start that now. I don't know that any part of that is going to change based on what happens in the bankruptcy court or based on what happens when and if the Cypriot entities or the other defendants show up or don't show up. We had our claims, we have certain discovery we think should happen, and there's no reason why we should wait, in our view, to do that.

Likewise, on prejudice, we don't really see what the prejudice is to anyone in conducting that discovery from Reed Smith now or from others now in a context where delay is problematic. And so if we first start having conversations with Reed Smith about document discovery here in August or in September or whenever, that would just be a delay of months in beginning a conversation that needs to happen anyway. So it seems to us that that should begin quickly.

And then on the likelihood of success on the motion to dismiss, all I will say is your Honor has already determined that there was fraud on the arbitrator. Your Honor has already determined that Reed Smith made certain false factual statements to the arbitrator. The notion in that context that there is, as a matter of law, no liability at Reed Smith seems to us not well taken.

THE COURT: But you haven't, Mr. Nesser, actually addressed the subject matter jurisdiction points, which, as you know, I didn't address those in withdrawing the reference. My view was, and still remains, that it's more efficient for me to decide that issue, one way or another, than to have Judge Mastando decide it and then to have the parties come back to me.

MR. NESSER: Certainly, I agree. But I will say the reason I didn't address it is because, as I said, nobody's made an argument for stay of discovery on the other side.

But maybe I'm mistaken, and your Honor obviously is the decision maker here, but I think supplemental jurisdiction here is pretty clear. We plainly have bankruptcy jurisdiction with respect to the allegations arising out of and relating to the proof of claim. That's arising in jurisdiction, that's not even related to jurisdiction. The resolution of these claims, by the way, will have direct impacts on the allocation of liability as between Holdings and various other parties in the bankruptcy, so it directly implicates the administration of the estate.

And then the questions about Reed Smith's conduct, the issues -- the facts that are at issue on the proof of claim are the same facts, in very significant part, that are at issue in our counterclaims in the arbitration, and that were at issue in the vacatur proceeding, and that are now at issue here. It's the question of was there -- did people do things and say things in the arbitration that were not true, and did that create liability? And that was the argument we made before, it's the same argument we're making now, and really is all bound up with the proof of claim.

So I won't even address the other bases for subject matter jurisdiction, but supplemental jurisdiction, to me, seems pretty clear.

THE COURT: So before I ask you if there's anything else and then turn to Ms. Furey, what would you say about my

concern that there still are significant persons who are not parties to -- persons who are parties to this who are not here today and the risk that discovery might need to be redone once they appear?

Mr. Nesser?

MR. NESSER: That was a question for me? I thought that was a question --

THE COURT: That's a question to you, Mr. Nesser. Why I should wait until after the Cypriot entities have been served so that there's not duplicative discovery going on. If there's not going to be final relief with respect to the Cypriot entities until they're served, what's the rush in getting going with respect to Reed Smith, and why shouldn't I make sure that there's one document request that goes to Reed Smith, one document request that goes to your clients, one document request that goes to Ms. Furey's -- maybe I'll put it a different way -- requests that go out at the same time so that the person who's putting together the documents can put together everything and make one production all at once to every party?

MR. NESSER: Again, I think that the document -- the short answer to your question, your Honor, is, we think that with respect to Reed Smith, it makes sense to get started now, because there will be some amount of time necessary to get those issues up and running and get discovery up and running.

And it is clear to us that Reed Smith -- the discovery from Reed Smith will be the most significant and the most time-consuming relative to the other. And the issue of -- so I don't believe that, from my part, that discovery from Cyprus and Greece is going to be a significant part of what we expect or intend to do.

As to any requests that they may want to make - and, again, your Honor addressed this in the vacatur proceeding — it's their documents. I mean, it's a document that they sent and that they received. Are they going to be sending document requests to -- are the Cypriot entities going to be sending document requests to Reed Smith? For what? Are the Greeks going to be sending document requests to their former lawyers? For what?

It seems to us that the core of what is relevant in this case, from our perspective, is going to be coming from stuff that's already been done, and then primarily stuff from Reed Smith. And we'd like to get started with that. And we don't really see that there's any prejudice to doing that.

THE COURT: Ms. Furey, let me hear from you.

MS. FUREY: Thank you, your Honor.

I don't have much to add to what Mr. Nesser said. I did want to just clarify what is going on in the adversary proceeding before Judge Mastando. Reed Smith filed a motion to dismiss and motion to compel arbitration. The majority

shareholders filed a motion to dismiss. There was a hearing held before Judge Mastando on that about a month or so ago, maybe a little longer. At that hearing, the judge ordered, over the defendants' objection, that a Rule 26 conference be had between the parties and that a Rule 26(f) report be filed, and ordered a scheduling conference before him for -- it was supposed to be next week. Yesterday he moved that conference to July 30th. So that scheduling conference is now occurring on July 30th.

In the interim, we have had the 26(f) conference. Thereafter, the Reed Smith defendants moved to stay — the other defendants have not — but the Reed Smith defendants moved to stay, and the Court yesterday scheduled a hearing on that motion to stay for July 30th. So the scheduling conference in that case and the motion to stay will be heard on July 30th by Judge Mastando.

THE COURT: And that's a motion to stay what specifically, Ms. Furey?

MS. FUREY: It's a good question. It was not clear from the motion, to be honest with you. We're taking the position it should only be obviously a motion to stay the claims against Reed Smith. No other defendant filed a motion to stay. But it was unclear on the face of the motion if they were seeking to stay the entire case. But it is -- the grounds for that motion is the motion to compel arbitration that they

have pending.

THE COURT: Do you have a view, Ms. Furey, with respect to the coordination of discovery with Levona and, in particular, inviting Levona into the party that you're having in the bankruptcy court and vice versa, participating -- being able to use the discovery in this case for that proceeding?

MS. FUREY: I share the view that Mr. Nesser articulated earlier, which is, of course, if there's efficiency to be had and coordination to be done, sure, but the request to me fell flat, as well, when it's in the midst of a motion to stay in the case before Judge Mastando. When I asked, well, does that mean that the Levona case would be stayed if Judge Mastando stays the discovery against Reed Smith, and the answer was, you know, a noncommittal, not saying one way or another.

So, sure, I think that there's coordination -- can be coordination among pieces for sure, but I also share the view that the discovery is different. Mr. Nesser articulated how a lot of discoveries are even done with respect to the case, the adversary proceeding, the proceeding before you. In our case, the real focal point of the case is the posteffective date obstruction of the bankruptcy plan, for which a lot of discovery has not been done already.

THE COURT: All right.

Anything else from you, Ms. Furey?

MS. FUREY: No, that's all.

THE COURT: Okay.

I'm not sure whether it's Mr. Abramowitz or Mr. King who wants to go next.

MR. KING: I will start, your Honor. Let me -- obviously, your Honor has questions, and I do want to be sure to respond to particular things.

I think what we've just heard sort of underscores why not a full stay, your Honor, but like a pause, a deferral, of setting a schedule in this case makes sense. We have made a motion with respect to subject matter jurisdiction, personal jurisdiction over one of our defendants, Mr. Weller, who lives and works in the United Kingdom, on the merits of the claims, including statutes of limitations. Mr. Nesser has not even committed to us as to whether he is going to oppose the motion or file an amended complaint, and won't do so -- we have given an extension to July 24th. We won't even know the full scope of the -- we possibly won't know the full scope of the operative complaint and the allegations in this case until three weeks from now, your Honor.

The point that service on the Cypriots and the Greeks is still underway and the concern about duplicative discovery, if they get served after the fact and need to redo something, is also a pertinent consideration.

Mr. Nesser said that their delay is problematic.

Maybe so with respect to him getting a declaratory judgment against parties who might have an interest in Gas, but the claim against Reed Smith, the one he wants to pursue, is a claim for damages. Waiting to let the dust clear on some of the preliminary issues, both with Judge Mastando and with our motion to dismiss and a possible amended complaint before your Honor, to us makes imminent sense.

I am glad to hear that both Mr. Nesser and Ms. Furey agree that some coordination would be appropriate between these cases, because, look, whatever the focus of the case is, the claims, the facts, and the people involved and the discovery is going to overlap. It is going to be the same witnesses who have to be deposed in each case. Ms. Furey says her case is focused on the posteffective date period, but she doesn't deny, and couldn't deny, that her allegations do sweep in allegations about fraud in the arbitration and about what happened in the underlying events.

Mr. Nesser claims this is a follow-on from the vacatur and focuses on that time period, but he's also alleging posteffective date conduct and ongoing conduct by Reed Smith in 2025 and 2026. And he acknowledges, of course --

THE COURT: So, Mr. King, I appreciate reputations are at stake. Reputations are at stake — Rule 11 reputations are at stake in this case — reputations are at stake whenever people are accused of wrongdoing. This is all a preface to the

question.

The question is, I found it curious, your position, with respect to coordinating discovery in this proceeding with discovery in the Rule 11 proceeding. From what you've said so far, my assumption is that because you want them to proceed on separate tracks, Mr. Solomon, for example, will be deposed twice on exactly the same subjects in both cases and that you will not be heard to say, well, he's already answered these questions because you've taken the position these are two entirely separate cases.

MR. KING: I think what we're saying -- I don't have a problem if the discovery on the Rule 11 motion is reused in this case --

THE COURT: No, but I would assume that that's what your argument would be, but my question is whether it would be taken in this case at the same time. Your argument later on would be, well, listen, he doesn't have to be redeposed again because we agree that it can be used, but, you know, the notion would be that everybody who is interested in this case would be invited to the deposition in the Rule 11 case and vice versa.

MR. KING: Well, look, the deposition on Rule 11 discovery, I believe under your Honor's ruling, will be more narrow and more limited than the discovery that Mr. Nesser might want to take here. There will be overlap — to be sure, there will be overlap — but Ms. Furey is a party to that case,

I guess, although it is not her motion. I do think -- look --

THE COURT: It's the position you're taking — you've heard me — that if these proceed separately, it's very likely that I will conclude that they should be treated separately and that the party who doesn't ask a question in Rule 11 will not have compromised their rights to ask the question in this case because, for example, I don't know whether Ms. Furey is moving for Rule 11 sanctions --

MR. KING: She did. And, look, I believe — and Mr. Abramowitz may have a view here, too, because he is also counsel to Mr. Solomon — we believe that the deposition that will take place in the Rule 11 context is more narrow. It is limited to Mr. Solomon's declaration, that is what your Honor has said, and testing the factual assertions in that declaration.

To be sure, some of those issues will overlap and can be reused here, and if Ms. Furey later has questions on the merits in this case when we get to the depositions in this case, we will not object to her asking those questions at that time. But we do think -- remember where we are on the Rule 11 motion. Levona made a motion. They had the burden of proof. We have said they have failed to satisfy their burden of proof. We nevertheless put in contrary evidence to underscore our position in that case. And, at that point, Mr. Nesser said, oh, I need some discovery to test these factual assertions.

That does not open up -- and your Honor made clear, I think, in ruling that discovery could be allowed, that this was not a hunt for new evidence to support their motion. They made their motion based on the evidence they had and the evidence they presented. It was not a hunt for new information. So I don't think that the deposition that will take place there is as broad-ranging as will take place in this case.

MR. ABRAMOWITZ: If I may be heard on that?

THE COURT: Mr. Abramowitz, I'll turn to you — you'll have your opportunity — so jot down what you want to say.

Let me hear from Mr. King the rest of what he wants me to know with respect to the schedule, and also in response to Mr. Nesser and Ms. Furey's arguments.

MR. KING: I do think that Mr. Nesser is underplaying the scope of international discovery that will be necessary. We do get to take discovery here as well. We're going to be seeking discovery not just from the parties that have sued us, but from Canadian third-party entities. As your Honor knows from reading the arbitration award, at least the arbitrator concluded — and I recognize your Honor has vacated that award, so I am not suggesting that you're bound by it — but the arbitrator found that Levona played some games with respect to discovery and some bait and switch as to who had documents and possession of documents. We're going to have to take discovery of merchants in other Canadian entities in order to be sure we

get the fulsome discovery. I can't rule out the possibility that when we take discovery on issues of damages and causation in this case, allegations that Reed Smith interfered with Gas's ongoing rights and whatnot, that that will open up third-party discovery from overseas entities.

It is surely the case they are alleging damages arising from the UniGas transaction, for instance. We're entitled to take some discovery about what all that meant.

So I just think that a deferral, your Honor, until the dust settles on the preliminary motions before your Honor and before Judge Mastando take place is wise. It allows Mr. Nesser to get service accomplished of the other entities. We will find out if they will appear or not. I appreciate your Honor saying you didn't put much stock in what I said about it, and it's a hundred percent true — I don't know whether they will appear or not. I'm basing my guesstimate on what they've done in the past, but that's it.

THE COURT: And, Mr. King, I'm sure you appreciate it was not meant to be a personal comment about you or anybody else. You've got a client, Mr. Abramowitz has clients, you all have clients.

MR. KING: It was a totally appropriate comment, your Honor, and I agree with you. I don't know what is going to happen. And, yes, I'm only looking out for our client and what is likely to happen here as well.

Let me address one thing that both Mr. Nesser and Ms. Furey said, which is how can we be expected to coordinate discovery with a case that Reed Smith says might go away. I am not asking that if we are successful in getting Judge Mastando to either compel the case to arbitration or stay discovery against Reed Smith or dismiss the case entirely, that that affects Mr. Nesser's ability to go forward. I'm just saying we will know a whole lot more in 30 or 60 days, including with respect to what remains in this case and whether your Honor finds subject matter jurisdiction for any of this discovery to be taking place. I think at that point, we will have a clearer picture of what needs to be done and how to proceed efficiently here.

THE COURT: I may have some follow-up questions, but let me hear from Mr. Abramowitz, and then I'll ask the questions.

Mr. Abramowitz.

MR. ABRAMOWITZ: Good morning, your Honor. First of all, I want to thank you for the courtesy you showed in our request for an adjournment of the original date for the case management hearing. I want to thank you very much for that.

THE COURT: I hope you have a good trip, Mr. Abramowitz.

MR. ABRAMOWITZ: Thank you. Thank you very much. I appreciate that.

I just want to emphasize the point that Mr. King made before about the fact that the Rule 11 aspect of the cases before you can go ahead independently and should go ahead independently. As Mr. Nesser confirmed, we are essentially cooperating with each other as far as the limitations of the discovery for the Rule 11 is concerned, and that may be moving on a much faster track than the rest of the cases that were discussed this morning.

It is essential, in my view — and I think in my clients' view — that the Rule 11 motion be heard and decided as quickly as possible because it does -- the pendency of the motion itself is affecting the reputational -- reputation of my client and the firm.

To the extent that it may be duplication later, I don't think we have objection to that. We really want to move the Rule 11 motion on a separate and quicker schedule than the rest of the cases would demand. And that's the only point I wanted to make.

THE COURT: Let me ask you, Mr. King, a question about the schedule, in particular the schedule that you've submitted and the competing schedule that has been submitted by Levona. Mr. Nesser makes the point that has some force with me, that with respect to -- at least with respect to what his principal requests are going to be, which is documents from your clients, there's no reason to delay, the absence of the Cypriot entities

shouldn't give me concern because they're going to have access to the client file, whatever Reed Smith has, they've got a right to get independent of discovery. He didn't say this, but I'm saying it now, as long as they are in by the time the depositions take place, I shouldn't worry about their rights being compromised. He also says he's not going to need much international discovery. You say that you are going to need some international discovery, which means the drafting of letters of request and all of the time that that takes.

So I guess two questions:

One is: Why shouldn't I permit discovery to start so that at least with respect to those matters that I have just talked to you about, depositions are going to be some ways off — unless they take place in the bankruptcy case, in which case, there may be some coordination — but you at least get started?

And then, second, with respect to the timetable, there is an interest in getting these issues settled, one way or the other, particularly with respect to the declaratory judgment, that I agree to an end date closer to the end date suggested by Mr. Nesser than your end date if the Cypriot entities are -- it may at least encourage the Cypriot entities to join this case earlier, if they're going to join at all.

MR. KING: So to answer your question, your Honor, I think we need greater clarity on what is the complaint in this

case — is it the one that's on file or is there going to be an amended complaint, and what are the allegations in the amended complaint? And I do think that given that we've moved to dismiss, and I presume we would move to dismiss an amended complaint, but we haven't seen it, and I don't know what changes he might make to it on subject matter personal jurisdiction grounds, there are bigger concerns about imposing the costs of discovery when your Honor might not have subject matter jurisdiction and when various claims might not survive. I do think we should await resolution of the motions to dismiss before we kick off discovery in earnest, your Honor.

With respect to the point about declaratory judgment, that --

THE COURT: Really the point is not -- you've now addressed starting discovery. The conclusion date of discovery -- and I hear what you're saying about, well, I shouldn't set a conclusion date until we know whether the case belongs in this court or not. Do you have anything else to say with respect to the conclusion date of discovery?

MR. KING: With respect to the conclusion date of discovery, yes. What we've done, your Honor, is attempt to track what the parties proposed to Judge Mastando if he is inclined to get discovery started. If we are all agreed that there is overlap in the witnesses who will be deposed in this case, and the subject on which they will be questioned, then a

discovery -- a deposition deadline here of January, which is what Mr. Nesser is proposing, when what Eletson and we have proposed to Judge Mastando is more like a year, they will not be able to be coordinated, and people will end up being deposed twice if the schedules aren't roughly aligned, your Honor.

I don't think that the need for a declaratory judgment and the urgency that Mr. Nesser claims to need that with should impact what discovery schedule gets set in this case. I don't think -- I suppose, your Honor, it might in some way impact whether the Greek parties accept service and/or appear sooner. I think that's somewhat unlikely. But the declaratory judgment doesn't really affect Reed Smith very much at all. We don't have a dog in the fight as to who controls Gas. That is between other parties.

So setting a schedule based on that, when the only party that's here is Reed Smith, and the claims against Reed Smith are for money damages, I don't think that should be the driver of the schedule.

THE COURT: Two follow-up questions, one to Mr. Nesser, one to Ms. Furey.

Ms. Furey, is it correct that in the bankruptcy case, the schedule that Eletson has agreed to is close to the -- and has agreed to propose to Judge Mastando is close to what Reed Smith has proposed here?

MS. FUREY: With some exceptions, important ones.

Discovery -- there wasn't a lead-up, like is requested here, in terms of a delay in starting discovery. We are -- as I mentioned, we had our Rule 26 conference. We're going to file today a protective order and an ESI protocol. We're serving -- I believe today or even yesterday, discovery was served on majority shareholders. We're going to be serving discovery on Reed Smith. So discovery is starting. They have a pending motion to stay that will be heard on July 30th, but there isn't that delay to start unless Judge Mastando, of course, grants that motion to stay.

THE COURT: What about conclusion?

MS. FUREY: And on the conclusion, we had — Eletson had — initially proposed a shorter schedule, and with a caveat that if foreign discovery was not completed, it could trail that sort of close of discovery date. And the majority shareholders at Reed Smith objected to that, and as a counterproposal and as a compromise, we agreed to a longer discovery schedule because we thought that there could be foreign discovery that may trail at the end. And there is more foreign discovery, I believe, that will be happening in that case than in the current case before your Honor.

THE COURT: So the proposal I have from Reed Smith here provides for all discovery to be completed October 14th, 2027.

Is that consistent with what has been proposed to

Judge Mastando?

MS. FUREY: I am -- I might have to take a moment, your Honor, and come back to you on that. I just need to look up the rule. I don't want to say the wrong date, unless my colleague, Nate Koslof, has that date in front of him for the close of discovery on the Rule 26 report that we filed.

THE COURT: Mr. Koslof?

MR. KOSLOF: Yes, Judge, I do have the document in front of me here.

Substantial completion of party discovery is 250 days after entry of the order. And, again, there is some allowance of time for the international discovery process to play out with respect to what needs to be served through the Hague or otherwise. And I am just looking through to confirm. The deadline to complete domestic fact depositions is 360 days after entry of the order.

THE COURT: All right.

Mr. Nesser, a question to you pertains to the close of discovery. These issues do overlap, and it's difficult for me to conceive of discovery being closed in this case while discovery is still going on in that case.

Do you have a view?

MR. NESSER: Your Honor, I think the -- what I can say is that the scope of discovery that we envision here is narrower than what it sounds like is in consideration in the

other case. The other case involves all kinds of issues that postdate the bankruptcy plan, that have to do with the ongoing management and operation of a far-flung global shipping company. Those facts aren't really at issue in my case, and so it strikes me that -- I don't think anybody is suggesting we should have duplicative depositions, for example, but it ought to be possible, for example, to stage things so that if there are going to be overlapping depositions, we'll do them first on the schedule in this case, and then if there's trailing stuff relevant only to the second case, they can deal with it in the second case. It sounds like those depositions in the second case are primarily -- based on what I'm hearing people say, it sounds like the concern is primarily that international depositions, that it can be more significant there.

If I could just say two quick things in response to some of the statements that have been made.

Number one, it is not the case that the declaratory judgment claim that we've asserted is irrelevant to Reed Smith. It is directly relevant to Reed Smith. The Reed Smith defendants have made various arguments about why they think it's not an issue for them. The one thing they have never said is they would consent to entry of that declaratory judgment as against them with respect to their ongoing work or advice or coordination with the Greek and Cypriot entities. And so if and when Reed Smith wants to make that representation, perhaps

that would moot the DJ against them, but we have not heard that.

Number two, I just think if — and maybe your Honor is already here, I'm not certain — but if the issue is a concern for efficiency and coordination with the other case and so forth and so on, then they should just drop their objection to discovery beginning in the other case, and let's get both discovery processes underway. Because as it stands, the position I'm being put in — I'm not a party in that case — the position I'm being put in is that discovery in my case and the progress of my case is being held hostage to a motion to stay discovery in some other case. And so that's a difficult proposition for me to live with, especially in a context where the only circumstance in which none of this discovery is going to be relevant is if this case is dismissed in full and that case is dismissed in full. If this case survives, or if that case survives in the bankruptcy court, or if that case is sent to arbitration, any of those three scenarios, the discovery that we're talking about here is going to be useful to someone somewhere, not wasting effort. Their whole argument is that discovery is the same everywhere.

So if the concern about efficiency and coordination is real, then let's just drop the objection to discovery in the bankruptcy case and move forward.

THE COURT: Okay. All right. I think I've heard

enough from all counsel, and I can rule.

I am going to permit discovery to start. And I am going to approve the case management plan that is similar, but not identical to that, that is proposed by Levona in this case. It will be the dates for the close of fact discovery, and, therefore, the date for the start of -- the dates for expert discovery and for all discovery, as well as the dates for summary judgment papers, will all be extended by one month.

The dates for initial disclosures — I think July 16th is maybe a little bit early — so I am going to make that, instead of July 16th, July 23, and the dates for the service of interrogatories and for requests for production of documents — give me one moment — will be August 7th.

There may be some other tweaks that the Court will make to the schedule consistent with what I've set.

Let me give you my reasoning.

First of all, Mr. Nesser is correct that there has been no motion made for a stay of discovery. My ruling is without prejudice to a formal motion, which can be made by letter motion, made for a stay of discovery, but such motion will have to be supported by argument with respect to the burden of discovery and not just merits one way or the other of the motion to dismiss.

Second, as should be evident from my questions, my principal concerns have been, number one, to make sure that if

there is international discovery, that international discovery, the process for that, gets started so that it doesn't delay the conclusion of this case, recognizing that international discovery, which is reliant upon foreign authorities, does have the potential for delay. I'm now speaking to both sides with respect to that. There also have been issues with respect to document production, and I want to make sure that recognizing that there have been those issues, that does not delay the conclusion of this case, and it seems to me that there's no reason why document requests should be stayed.

The second thing that is driving this is the thoughts with respect to the nonappearing parties. The dates that I selected with respect to the close of fact discovery are intended to allow for the fact that those persons have not yet been served, and, thus, they do not yet have an obligation to say, we want to participate, and therefore we need time. I'm not presupposing a conclusion as to what I will say when they come in, if they come in, and say we want time for additional requests and to be prepared to take depositions.

I am further presuming that except to the extent the depositions need to be coordinated with respect to the other matters, that the depositions really are not going to practically begin in earnest in this case until after the Cypriot entities have been effectively served.

I'm also, in selecting these close dates, not

presuming that the Cypriot entities will appear. I contemplated a date that was further out, as suggested by Mr. King and Mr. Abramowitz, and the only justification I could come up with for that, if there was a justification, was because of the possible appearance of the Cypriot entities. I'm not presuming (a) that they will appear or (b) that they will present persuasive arguments for an extended period of time with respect to discovery.

Let me also speak a little bit to the arguments with respect to subject matter jurisdiction and personal jurisdiction.

I'm not trivializing those arguments, but Reed Smith has been subject to document requests in matters as to which there plainly is a right to discovery against them. And so with respect to the issues about them being subject to incremental requests for discovery, this is not a matter as to which they are particularly alien to, to the courts of this district, or where the discovery is on something that is completely different from this discovery to which they're already subject.

And then with respect to letters of request served by Reed Smith, if they want to serve letters of request — and I don't know whether they're going to be asking for them or not — but I'm not sure that that really counts as a burden, the fact that somebody's going to have to put together letters of

request which are not going to end up being the subject of depositions for some time. So I will enter a case management plan consistent with that.

I would appreciate, Ms. Furey, you, because you're counsel in both cases, informing the Court of the results of the July 30th conference before Judge Mastando. And then after the July 30th, assuming that discovery is open with respect to that case, I'm going to encourage the parties to coordinate discovery across both actions.

So that's my ruling. I'm going to go through counsel in the order in which I called on them initially.

Mr. Nesser, any questions or anything that I can clarify?

MR. NESSER: No, your Honor. Thank you very much.

THE COURT: Ms. Furey?

MS. FUREY: No, your Honor. Thank you.

THE COURT: Mr. King?

MR. KING: Nothing, your Honor.

THE COURT: Mr. Abramowitz?

MR. ABRAMOWITZ: My only concern is that we are -- our request that the sanctions discovery end hearing move independent of this case management plan or recognizing that there may be some duplication down the road.

THE COURT: I'm not going to rule one way or the other with respect to that. You've made the request, and this

conference has actually been calendared in the case that has been withdrawn and not that case. I have in that case taken note of your request.

Have a good 4th of July, everybody. I'll enter an order.

Mr. Abramowitz, have a good trip.

Thank you, all.

MR. ABRAMOWITZ: Thank you very much.

COUNSEL: Thank you.

(Adjourned)