**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ELETSON HOLDINGS INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br>Case No. 23-10322 (JPM)<br>Jointly Administered |
| LEVONA HOLDINGS LTD., ELETSON GAS LLC, and EMC GAS CORP.,<br><br>Plaintiffs,<br><br>v.<br><br>ELETSON HOLDINGS, INC., ELETSON CORP., APARGO LIMITED, FENTALON LIMITED, DESIMUSCO TRADING LIMITED, VASSILIS KERTSIKOFF, VASILIS HADJIELEFTHERIADIS, LASCARINA KARASTAMATI, REED SMITH LLP (DELAWARE), REED SMITH LLP (ENGLAND & WALES), CHARLES G. WELLER, and LOUIS M. SOLOMON,<br><br>Defendants. | Case No. 1:26-cv-03620-LJL<br><br>**AMENDED COMPLAINT** |

[1] The Debtors, now reorganized, were Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC (collectively, "Debtors").

## TABLE OF CONTENTS

**Page**


NATURE OF THE ACTION ..... 1

JURISDICTION AND VENUE ..... 3

A. Subject-Matter Jurisdiction ..... 3

B. Personal Jurisdiction ..... 4

C. Venue ..... 6

PARTIES ..... 6

A. Plaintiffs ..... 6

B. Defendants ..... 7

FACTS ..... 13

A. Levona's Arbitration Counterclaim And Bankruptcy Proof Of Claim ..... 13

1. Levona's Arbitration Counterclaim ..... 16

2. Levona's Proof of Claim ..... 17

B. The Harm To Plaintiffs From Defendants' Refusal To Cede Control Of Gas Or Its Subsidiaries And Conversion Of Gas's Assets ..... 18

CAUSES OF ACTION ..... 27

COUNT 1: Declaratory Judgment (Against All Defendants) ..... 27

COUNT 2: Conversion & Replevin (Against All Defendants) ..... 27

COUNT 3: Breach Of Contract (Against The Non-Reed Smith Defendants) ..... 29

COUNT 4: Tortious Interference With Contract (Against The Individual Defendants, Purported Nominees, and Reed Smith Defendants ) ..... 30

COUNT 5: Tortious Interference With Prospective Business Relationship (Against All Defendants) ..... 32

COUNT 6: Breach Of Fiduciary Duty (Against Holdings, Corp., The Individual Defendants, And The Reed Smith Defendants) ..... 33

COUNT 7: Legal Malpractice (Against The Reed Smith Defendants) ..... 34

COUNT 8: New York Judiciary Law § 487 (Against The Reed Smith Defendants) ..... 35

PRAYER FOR RELIEF ..... 36

Plaintiffs Levona Holdings Ltd. ("Levona"), Eletson Gas LLC ("Gas"), and EMC Gas Corp. ("EMC") allege as follows for their Amended Complaint against (i) Eletson Holdings, Inc. ("Holdings") and Eletson Corp. ("Corp."); (ii) Apargo Limited, Fentalon Limited, and Desimusco Trading Limited (collectively, "Purported Nominees"); (iii) Vassilis Kertsikoff, Vasilis Hadjieleftheriadis, and Lascarina Karastamati (collectively, "Individual Defendants" or "Former Principals"); (iv) Reed Smith LLP, a limited liability partnership under the laws of the State of Delaware, and Reed Smith LLP, a limited liability partnership in England and Wales (collectively, "Reed Smith"); and (v) Charles G. Weller, and Louis M. Solomon (collectively with Reed Smith, "Reed Smith Defendants").

## NATURE OF THE ACTION

1. Plaintiffs by this action seek to resolve claims against individuals and entities formerly associated with the Eletson shipping enterprise, including the claims Levona asserted in its December 2023 proof of claim in the related bankruptcy case (*see* Claim No. 21-1, the "Proof of Claim" (Exhibit A hereto)).

2. On January 12, 2026, the United States District Court for the Southern District of New York (Liman, J.) vacated an award that had been entered against Levona in a JAMS arbitration (the "Award" and "Arbitration"), ruling that the Award had been procured by fraud. D. Ct. ECF 678 (Exhibit B hereto) (the "Vacatur Decision").[2] The 138-page Vacatur Decision found, among other things, that Holdings, Corp., the Purported Nominees, the Individual Defendants, and their respective alter egos, as well as Reed Smith and Solomon in certain respects, had obtained the Award by intentionally presenting perjured testimony, fraudulently withholding documents,

[2] D. Ct. ECF citations refer to filings in *Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 23-cv-7331 (LJL) (S.D.N.Y.) (the "District Court Proceedings").

and making false representations to the arbitrator. Those rulings were issued based on a discovery record that had been developed during two-and-a-half years of litigation over which this Court presided.

3. Although the Vacatur Decision resolved many of the legal and factual issues that had been presented in the Arbitration and in the Proof of Claim, several issues remain actually or purportedly unresolved. ***First***, in its Arbitration counterclaims (the "Counterclaim," Exhibit C hereto) and its Proof of Claim—both of which were filed when the Reed Smith Defendants were acting as counsel to Holdings, Corp., and Gas in connection with the Award—Levona asserted that it owns Gas's preferred shares because the time-limited option to repurchase those shares (the "Purchase Option") had not been exercised and hence Levona has the right to control the operations of Gas and its subsidiaries. Certain Defendants, including the Reed Smith Defendants, continue to dispute that conclusion despite the clear findings and rulings in the Vacatur Decision. According to those Defendants, the relevant findings and rulings in the Vacatur Decision are not preclusive—either in general or as to them specifically. Indeed, despite the Reed Smith Defendants' knowledge that the Purchase Option was never exercised, they have continued to assert that there is a good-faith dispute about that issue and the ownership of Gas's preferred shares. ***Second***, in its Counterclaim and its Proof of Claim, Levona sought hundreds of millions of dollars in damages. Those amounts remain outstanding. ***Third***, Plaintiffs have incurred massive damages by virtue of Defendants' wrongdoing during and after the Arbitration including the Reed Smith Defendants' misconduct in conspiring with their former clients to advance wrongful positions, well beyond the bounds of traditional legal representation—a campaign they have undertaken, upon information and belief, in an effort to cover up and evade liability for their extensive prior wrongdoing and to secure a source of payment for tens of millions of dollars in

outstanding fees. It is appropriate for those issues and the others alleged below to be resolved now.

## JURISDICTION AND VENUE

### A. Subject-Matter Jurisdiction

4. This Court has subject-matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334, which confers original jurisdiction over proceedings "arising under title 11, or arising in or related to cases under title 11." Among other things: (i) this proceeding seeks resolution of Levona's Proof of Claim, may affect Levona's ability to recover on that claim, and may affect the ability of other creditors to recover on their claims; (ii) the confirmed chapter 11 plan (the "Plan," *In re Eletson Holdings Inc., et al.*, No. 23-10322 (Bankr. S.D.N.Y. filed March 7, 2023), Bankr. ECF 1132 at Art. XI) and associated confirmation order (the "Confirmation Order," Bankr. ECF 1212) expressly provide for the retention of jurisdiction over all matters arising out of and related to these chapter 11 cases (the "Chapter 11 Cases"), including specifically matters relating to claims involving Levona and the Arbitration; (iii) this proceeding involves the interpretation, implementation, consummation, execution, and administration of the Plan and will affect distributions to and allocations among creditors—including because the Reed Smith Defendants architected and aided in the wrongful control of Gas and its subsidiaries before and after Plan confirmation; and (iv) this proceeding, including the facts, issues, and claims at issue, bear a close nexus to the Chapter 11 Cases.

5. Indeed, the nomination theory discussed below was concocted by the Reed Smith Defendants and developed at the instigation of the Reed Smith Defendants and with their assistance, shortly after the filing of the Chapter 11 Cases, for the admitted purpose of evading creditors; the Bankruptcy Court issued a stipulated Stay Relief Order addressing the Arbitration claims; and, at the request of various Defendants, the Bankruptcy Court stayed discovery on

Levona's Proof of Claim pending disposition of the vacatur and confirmation proceedings in this Court—*i.e.*, the District Court Proceedings. *See* Bankr. ECF 811 (5/31/2024 Hr'g Tr.) at 8 ("[A]ll discovery regarding the Levona claim objection is stayed, and the evidentiary hearing on the claim objection is adjourned to a date to be determined."); Bankr. ECF 865 (6/18/2024 Hr'g Tr.) at 243 ("The Court will stay the remainder of the discovery issues regarding the Levona claim objection at this time, pending any ruling in the district court.").

6. This Court also has subject-matter jurisdiction under 9 U.S.C. § 203, which confers original jurisdiction over actions to compel, confirm, or vacate an arbitral award and several other measures in aid of an arbitration. This action seeks to remedy the misconduct that Defendants engaged in during the Arbitration, in related proceedings, and otherwise.

7. To the extent this Court does not have original jurisdiction over a claim or claims alleged herein, it has supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367 because they "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." This case is yet another part of the "flood[ of] filings arising out of the dispute … over the ownership and control of what is reputed to be among the largest natural gas shipping company in the world." ECF 19, at 1-2. The claims here seek, among other things, to remedy Defendants' misconduct in obtaining the Award by fraud and undue means and then misusing the Award and attempting to cover up their wrongdoing in an effort to evade liability for their misconduct, retain wrongful control over Gas, affect the outcome of the bankruptcy case, and, as to the Reed Smith Defendants, secure a means of recovering their substantial unpaid legal fees.

**B. Personal Jurisdiction**

8. This Court has personal jurisdiction over each Defendant pursuant to Rule 7004 of the Federal Rules of Bankruptcy Procedure. Each Defendant has maintained at least minimum

contacts with the United States in connection with the claims asserted herein, including by the Debtors' voluntary commencement of the Chapter 11 Cases (as authorized by their controlling parties); the Debtors' participation in the Chapter 11 Cases; Defendants' participation in the Chapter 11 Cases; Defendants' participation in the District Court Proceedings; and Defendants' participation in the Arbitration.

9. Weller was and purports to still be lead relationship counsel to various Eletson entities and to various other Defendants in connection with the matters at issue herein. He billed hundreds of hours of time in the Arbitration. He also provided counsel to Holdings, Corp., and other Defendants in the Chapter 11 Cases and in the District Court Proceedings. Indeed, Weller was one of just two individuals to whom Eletson sent the July 20, 2022, "Instructions" discussed in the Vacatur Decision; those "Instructions" informed Reed Smith of Eletson's view that the Purchase Option had not been exercised. *See* D. Ct. ECF 678, at 85 ("The instructions … unambiguously state that '[t]he terms of the BOL have not been entirely complied with and in particular the obligations set out in clauses 2.2–2.5 of the BOL relating to the 'Purchase Option Period' and Eletson Gas defaulted on the Loan Agreement.' … The instructions continued that 'all parties behaved as if BOL was still valid and effective (despite the lapse of the Purchase Option Period).'").

10. Solomon is a resident of New York; maintains his primary office in New York; was lead litigation counsel in the Arbitration (which was seated in New York), the District Court Proceedings, and the Chapter 11 Cases; and has functioned as actual or purported lead counsel to various Defendants and others in related proceedings globally.

11. Reed Smith participated in various proceedings in New York, including the Arbitration, and including from an office in New York. Solomon and Weller were acting in their capacity as members, partners, or employees of Reed Smith at all relevant times.

**C. Venue**

12. Venue for these Chapter 11 Cases in this Court is proper under 28 U.S.C. § 1408. Venue for this adversary proceeding in this Court is proper under 28 U.S.C. § 1409 because it is a proceeding under the Bankruptcy Code and arises in and is related to the Chapter 11 Cases.

13. Each Defendant knowingly involved itself in proceedings in New York relating to the claims and facts at issue in this proceeding, including by variously stipulating to dispute resolution clauses requiring adjudication in New York; intervening and otherwise participating in the related District Court Proceedings and Bankruptcy Court proceedings in New York; attending the Arbitration, the Chapter 11 Cases, and the District Court Proceedings; attending meetings in New York; and providing advice and representation in connection with proceedings in New York.

14. Plaintiffs do not consent to the entry of final orders and judgments by the Bankruptcy Court in this adversary proceeding pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

## PARTIES

**A. Plaintiffs**

15. Levona is a special purpose entity incorporated under the laws of the British Virgin Islands. As owner of Gas's preferred shares, Levona has authority to cause Gas (and its subsidiaries, including EMC) to pursue litigation.

16. Gas is a limited liability company formed under the laws of the Republic of the Marshall Islands. As of January 2022, Gas was governed by its Third Amended and Restated Limited Liability Company Agreement ("LLCA"). D. Ct. ECF 67-2; *see* D. Ct. ECF 551-91

(further amending the LLCA to increase the number of board seats). Holdings owns 100% of Gas's common shares, and Levona owns 100% of Gas's preferred shares. As alleged above, Gas is controlled by Levona, which is directing Gas's and EMC's actions in this litigation.

17. EMC, a wholly owned subsidiary of Gas, is a corporation formed under the laws of the Republic of the Marshall Islands. It provides certain management services to Eletson's fleet of ships. Its actions in this proceeding are being directed by Levona.

**B. Defendants**

18. Holdings, a Debtor in the Chapter 11 Cases, is a corporation domiciled in the Marshall Islands. Together with Levona, it is the ultimate parent of the Eletson family of companies (collectively, "Eletson"). Eletson is an international gas shipping company that owned and operated a fleet of medium and long-range gas tanker ships that carry a wide range of refined petroleum products, including crude oil. Eletson operated its fleet through subsidiaries that owned or chartered the vessels. Holdings was previously owned by Lassia Investment Co., Glafkos Trust Co., and Family Unity Trust Co. (collectively, "Former Majority Shareholders"), each of which previously held approximately 30.7% of the equity in Holdings, and by Elafonissos Shipping Corp. and Keros Shipping Corp. (collectively, "Former Minority Shareholders"), each of which previously held 3.92% of the equity in Holdings.

19. Corp. is a corporation organized under the laws of Delaware and is a wholly owned subsidiary of Holdings. Corp. provided certain management services to Eletson's fleet of ships in exchange for a management fee.

20. Apargo is on information and belief a Cypriot entity with its registered address at Ifigeneias 17, 2007 Strovolos, Nicosia, Cyprus. Apargo's parent company is on information and belief Davit Seas Limited. On information and belief, the Kertsikoff family is the actual or ultimate

beneficial owner and controller of Apargo. Defendant Kertsikoff acted as a "representative" of Apargo during the Arbitration and the District Court Proceedings. Bankr. ECF 1850 ¶ 8.

21. Fentalon is on information and belief a Cypriot entity with its registered address at Ifigeneias 17, 2007 Strovolos, Nicosia, Cyprus. Fentalon's parent company is on information and belief Ascella Limited, a privatelyheld entity. On information and belief, the Karastamati family is the actual or ultimate beneficial owner and controller of Fentalon. Defendant Karastamati acted as a "representative" of Fentalon during the Arbitration and the District Court Proceedings. *Id.*

22. Desimusco is on information and belief a Cypriot entity with its registered address at Ifigeneias 17, 2007 Strovolos, Nicosia, Cyprus. Desimusco's parent company is on information and belief Blige Corporation, a privately held entity. On information and belief, the Hadjieleftheriadis family is the actual or ultimate beneficial owner of Desimusco. Defendant Hadjieleftheriadis acted as a "representative" of Desimusco during the Arbitration and the District Court Proceedings. *Id.*

23. Kertsikoff was previously (i) an officer and director of Holdings, (ii) a legal representative of Eletson Finance (US), (iii) an officer and director of Corp., (iv) an officer and director of EMC Investment Corporation, (v) a director, officer, owner, and/or beneficiary of Family Unity, a Former Majority Shareholder, (vi) a representative of Apargo, and (vii) along with family members, the actual or ultimate beneficial owner of Apargo and Davit Seas. Kertsikoff is first cousins with Karastamati and Hadjieleftheriadis. On information and belief, Kertsikoff also was an accountant and bookkeeper for various Eletson entities. Upon information and belief, Kertsikoff continues to assert to third parties that he controls Holdings, Gas, and/or their subsidiaries. Upon information and belief, Kertsikoff maintains a residence in Greece and owns or owned real estate in the United States and conducts or conducted business in or directed at the

City and State of New York. Kertsikoff has been sanctioned by the Bankruptcy Court on multiple occasions for being in continued violation of the Plan and Confirmation Order. Kertsikoff also testified as a witness in New York and submitted declarations and witness statements in New York during the Arbitration, the Chapter 11 Cases, and the District Court Proceedings.

24. Hadjieleftheriadis was previously (i) an officer and director of Holdings, (ii) a legal representative of Eletson Finance (US), (iii) an officer and director of Corp., (iv) an officer and director of EMC Investment Corporation, (v) an officer and director of Special Maritime Entities associated with Eletson vessels ("SMEs"), (vi) a representative of Desimusco, and (vii) along with family members, the actual or ultimate beneficial owner of Desimusco and Blige. Hadjieleftheriadis is first cousins with Karastamati and Kertsikoff. On information and belief, Hadjieleftheriadis also was an accountant and bookkeeper for various Eletson entities. Hadjieleftheriadis is currently and has been a director, officer, owner and/or beneficiary of Glafkos, a Former Majority Shareholder. As of February 24, 2025, Hadjieleftheriadis became an officer, owner and/or beneficiary of Lassia, a Former Majority Shareholder. Hadjieleftheriadis had the actual or purported authority to transfer funds to and from the historical bank accounts of Corp., EMC, and, on information and belief, all other subsidiaries. Upon information and belief, Hadjieleftheriadis maintains a residence in Greece and conducts or conducted business in or directed at New York. He has been sanctioned by the Bankruptcy Court on multiple occasions for being in continued violation of the Plan and Confirmation Order. Hadjieleftheriadis testified in New York and submitted declarations and witness statements in New York during the Arbitration; testified remotely and submitted declarations during the Chapter 11 Cases; and submitted declarations during the District Court Proceedings.

25. Karastamati was previously (i) an officer and director of Holdings, (ii) a legal representative (and a self-described director) of Eletson Finance (US), (iii) an officer and director of Corp., (iv) an officer and director of the SMEs, (v) an officer and director of EMC Investment Corporation, (vi) an officer, owner, and/or beneficiary of Lassia, a Former Majority Shareholder, (vii) a representative of Fentalon, and (viii) along with family members, the actual or ultimate beneficial owner of Fentalon and Ascella. Karastamati is first cousins with Kertsikoff and Hadjieleftheriadis. Karastamati is a lawyer and was an in-house lawyer at Eletson. On information and belief, Karastamati also was an accountant and bookkeeper for various Eletson entities. Karastamati had the actual or purported authority to transfer funds to and from the historical bank accounts of Corp., EMC, and, on information and belief, all other subsidiaries. Upon information and belief, she maintains a residence in Greece and conducts or conducted business in or directed at New York. She has been sanctioned by the Bankruptcy Court on multiple occasions for being in continued violation of the Plan and Confirmation Order. She testified in New York and submitted declarations and witness statements in New York during the Arbitration and the Chapter 11 Cases and also submitted declarations in the District Court Proceedings.

26. Reed Smith LLP, a limited liability partnership under the laws of the State of Delaware, and Reed Smith LLP, a limited liability partnership in England and Wales, are part of a global law firm that has a major office in New York. They have acted for Eletson for decades, including in the Arbitration and the District Court Proceedings. Reed Smith's compensation for its work in the Arbitration depended in part on the outcome of the Arbitration. Since the November 2024 Effective Date of the Plan, which called for the automatic termination of Reed Smith, Reed Smith has claimed to represent an ever-changing set of purported (but non-existent) entities, including "Provisional Holdings" (D. Ct. ECF 468, at 1), "Holdings (Greece)" (D. Ct. ECF 545,

at 1), and "Unreorganized Holdings" (D. Ct. ECF 624, at 1). Reed Smith also wrongly claims or has claimed to represent Holdings, Corp., Gas, and EMC, as well as Kertsikoff and Karastamati, in various proceedings and arbitrations around the world.

27. Weller is a litigation partner at Reed Smith. He was for many years lead relationship counsel to various Eletson entities and individuals, including on information and belief some or all of the Purported Nominees and Individual Defendants. He wrongly purports to continue to serve as lead relationship counsel to some or all of those entities and individuals. On information and belief, he maintains a residence in London and conducts business in New York.

28. Solomon is a litigation partner at Reed Smith and, until December 2025, was listed on Reed Smith's website as Head of International Litigation for the firm. He was among other things lead litigation counsel to Holdings and Corp. in the Arbitration, the Chapter 11 Cases, and the District Court Proceedings. He maintains a residence in New York, New York and conducts business in New York.

29. Holdings and Corp. (while under their former ownership), the Individual Defendants, and the Purported Nominees are and were at all relevant times alter egos and/or agents of one another who act in concert with one another and/or conspire with one another. For example, this Court found that all three Purported Nominees "operate[] as an indivisible unit, and the individual companies are indistinguishable." D. Ct. ECF 678, at 45. In the District Court Proceedings, they "appeared collectively" and "presented no distinct arguments" or "unique legal strategies." *Id.* at 45-46. Also as this Court stated, "functionally," they "share the same counsel …, the same physical address (which is the same address as Eletson …), … and the same accountant." *Id.* at 46. Accordingly, for instance, "the [Purported Nominees] and their principals are one and the same" and no other individuals have "actual control over the three shell entities."

*Id.* at 42, 45; *see id.* at 51 ("the [Purported Nominees] cannot be distinguished from their principals").

30. Indeed, each Purported Nominee is owned by siblings and operated without corporate formalities, with board meetings either not conducted at all or conducted only informally by family members without formal corporate resolutions. D. Ct. ECF 551-1 (Kertsikoff Tr.), at 380:15-382:6. Eletson and the Purported Nominees also have a web of overlapping owners, directors, and officers. *See* D. Ct. ECF 549 (Vacatur Brief), at 7-9. Financial statements are generated sporadically, if at all, with the 2021 statements having been filed in 2025 and none for any intervening years. *See* D. Ct. ECF 551-90, at 10-13; D. Ct. ECF 551-1 (Kertsikoff Tr.), at 363:2-367:3. Capitalization levels are on information and belief low or nonexistent—for example, for fiscal year 2022, Apargo was operating with only €1,200 in share capital while relying on €10,001 in informal, interest-free shareholder loans with no predetermined repayment terms. D. Ct. ECF 551-90, at 10-13; D. Ct. ECF 551-1 (Kertsikoff Tr.), at 345:25-347:15 (Kertsikoff unable to testify about any investments or the cash held by the Purported Nominees). And the Purported Nominees do not use separate offices, email addresses, computer systems, or phone numbers. *See* D. Ct. ECF 551-1 (Kertsikoff Tr.), at 373:6-374:12, 379:23-382:6; *see id.* at 390:14-393:11, 410:7-413:4, 445:7-17 (noting that the Purported Nominees used eletson.com emails at least until the Arbitration); *see generally* D. Ct. ECF 549 (Vacatur Brief), at 7-9.

31. Defendants all acted in concert with one another, conspired together, aided and abetted one another, and/or acted as agents of one another, to carry out the misconduct at issue here.[3] For instance, the Reed Smith Defendants intentionally pursued a wrongful Award. D. Ct.

---

[3] Plaintiffs do not seek recovery from Holdings or Corp. for conduct that took place after the Effective Date of the Plan in November 2024.

ECF 67-16, at 8-9. They also initiated, financed, and/or defended multiple litigations and arbitrations on behalf of multiple other Defendants against Levona and others around the world, premised on the knowingly false position that the Purchase Option had been exercised for the benefit of the Purported Nominees and that the Award had not been obtained through fraud. Moreover, to avoid the consequences of the Chapter 11 Cases, the Reed Smith Defendants invented the theory that a nominee had been designated to receive Gas's preferred shares, took affirmative steps with the other Defendants to "create the fabricated backstory" to support the supposed nomination, and took the lead in presenting the false nomination theory in the Arbitration, the Bankruptcy Court, and elsewhere. D. Ct. ECF 678, at 113. The Reed Smith Defendants also made "patently untrue" statements to the arbitrator about withheld evidence, thereby procuring a breach of the LLCA's arbitration provision (including the covenant of good faith and fair dealing implied therein) and depriving Levona of its contractual right to arbitrate its counterclaims against Holdings and Corp. *Id.* at 125-26.

## FACTS

### A. Levona's Arbitration Counterclaim And Bankruptcy Proof Of Claim

32. As set out in the numerous pleadings, orders, and filings in this Court and the Bankruptcy Court—including the Vacatur Decision, which is incorporated herein—Levona in July 2022 exercised its authority as holder of the preferred shares of Gas to seek to sell a portion of Gas's fleet to Unigas for $262 million. There was no legal basis to oppose Levona's authority to enter into that transaction, including because the Purchase Option as set out in a "Binding Offer Letter" ("BOL") with Levona had not been exercised.

33. Nonetheless, the Defendants thwarted the Unigas deal and wrongly exercised control over Gas by among other things sending improper cease-and-desist letters, bringing a wrongful Arbitration, obtaining the Award by "purposefully present[ing] false testimony at the

arbitration and withhold[ing] from Levona and the Arbitrator the documents necessary to show that such testimony was false and to reveal the truth," and seeking to enforce the wrongful Award in multiple jurisdictions globally. *Id.* at 34. For example and as found in the Vacatur Decision, various Defendants made "patently untrue" statements to the arbitrator, and the Reed Smith Defendants' conduct crossed the "important line between aggressive advocacy and false statements." *Id.* at 125-28. Moreover, the Reed Smith Defendants as "counsel" in the Arbitration not only "understood" the fraud—especially via their clients' "unvarnished communications" revealing the truth—but also took intentional and affirmative steps to conceive, instigate, architect, aid, and abet it. *Id.* at 34, 84. Thereafter, Defendants, including the Reed Smith Defendants, took affirmative steps to conceal their misconduct for years, including by continuing to withhold the relevant evidence and lying in multiple fora, as set out more fully in the Vacatur Decision.

34. The Reed Smith Defendants acted as counsel to Holdings, Corp., and Gas in the Arbitration. Indeed, according to the Award, Gas was not named as a party in the Arbitration merely because it "could not bring [the Arbitration] claim on its own," and Holdings and Corp. had thus agreed to "turn over any damages to Eletson Gas." D. Ct. ECF 67-58, at 89. The Award similarly stated that "some of [Levona's requested] relief would have in fact been derivative relief." *Id.* at 89 n.9. The Reed Smith Defendants "made clear throughout the[ Arbitration] proceedings that [Holdings and Corp.] would turn over any damages to Eletson Gas" and that Holdings was exercising its "right and interest in gaining compensation for Eletson Gas, a party that [the arbitrator] found could only appear by the Arbitration parties." D. Ct. ECF 54, at 14 (citing D. Ct. ECF 67-58, at 88 & n.9); *see* D. Ct. ECF 551-42, at 10, 16 (second amended statement of claim in the Arbitration requesting "[c]ompensatory damages for all the harm caused to [Gas] and/or [Holdings and Corp.] by reason of Levona's misconduct"); D. Ct. ECF 551-43, at

23, 30 (third amended statement of claim in the Arbitration requesting same); D. Ct. ECF 67-50 ¶¶ 795, 798, 800 (post-hearing brief in the Arbitration requesting payment of over $22 million in compensatory damages to Gas and at least $10 million in other damages payable to Gas or the Purported Nominees); 1/2/2024 D. Ct. Hr'g Tr. at 120:17-123:5 (Solomon stating that the Reed Smith Defendants "brought … effectively derivative claims" "on behalf of Gas" in the Arbitration and that "any money that's derivative" would be "turn[ed] … over to Gas").

35. The Reed Smith Defendants had a significant financial interest in the outcome of the Arbitration. During the Arbitration, Reed Smith agreed to a contingency arrangement pursuant to which it significantly discounted its ordinary hourly fees in exchange for the right to a success fee (ultimately worth millions of dollars) if it prevailed in the Arbitration. Despite the discount implemented pursuant to that arrangement, Reed Smith's fees went consistently unpaid, in amounts that increased significantly over the life of the Arbitration and related proceedings and that ultimately totaled tens of millions of dollars. Reed Smith agreed to numerous increasingly desperate arrangements for these fees to be paid and, on information and belief, for a post-Arbitration success-fee arrangement. Upon information and belief, tens of millions of dollars of Reed Smith's fees remain unpaid. As a consequence, Reed Smith has conceived of, architected, and instigated litigation across the globe, and taken related steps that transcend ordinary legal services, to attempt to wrongfully maintain the Individual Defendants' control of Eletson and ensure that the firm is paid. Indeed, at various times, funds and revenues rightfully belonging to Gas, EMC, and/or their subsidiaries have been wrongfully diverted to pay Reed Smith's legal fees—an arrangement the Reed Smith Defendants not only were aware of but on information and belief conceived, architected, and assisted in implementing. At minimum, the Reed Smith Defendants were complicit in that wrongdoing as agents, co-conspirators, and aiders-and-abettors.

36. In response to the misconduct described above, Levona previously asserted two sets of claims against various Defendants: its Arbitration Counterclaim against Holdings and Corp. and its Proof of Claim against Holdings. They are addressed in turn below.

**1. Levona's Arbitration Counterclaim**

37. On August 19, 2022, Levona filed its Counterclaim in the Arbitration. D. Ct. ECF 67-17. It is attached hereto as Exhibit C.

38. The Counterclaim and all allegations therein are incorporated and realleged by reference here.

39. Among other things, the Counterclaim alleged that Holdings and Corp. had mismanaged Gas and wrongly prevented Levona from completing the Unigas transaction and selling the *Symi* and *Telendos*, which were originally ships in Gas's fleet. D. Ct. ECF 67-17.

40. The Counterclaim also alleged that Holdings and Corp. had breached Gas's LLCA, tortiously interfered with Gas's business relationships, and converted Levona's property. D. Ct. ECF 67-17.

41. As relief, Levona sought, among other things, an order requiring any Eletson agent to vacate the *Symi* and *Telendos*; a declaratory judgment that the Purchase Option had not been exercised; a declaration that Levona remained in control of Gas's preferred shares; a declaration that Levona was authorized to execute the deal with Unigas as contemplated; compensatory damages for all the harm caused to Gas and Levona; punitive damages; and Levona's fees and costs in the Arbitration. *Id.* ¶ 48.

42. The arbitrator denied the Counterclaim, but only because of Defendants' wrongdoing. Had Defendants not engaged in that wrongdoing, Eletson's Arbitration claims—including that it controlled Gas—would have failed, and Levona's Counterclaim would have succeeded. *See* D. Ct. ECF 678, at 93 (this Court, finding that "[i]f no notice had been given, not

only would Eletson's [Arbitration] claims"—including that it controlled Gas—"have necessarily failed, but also Levona's counterclaims likely would have succeeded"). And the Counterclaim included requests for "[a] declaratory judgment that the Loan was not repaid and the Option not executed," "[a] declaration that Levona remains in control of the preferred shares," and "[a] declaration that Levona is duly authorized to execute the deal with Unigas as contemplated." D. Ct. ECF 67-17, at 14.

**2. Levona's Proof of Claim**

43. On December 18, 2023, Levona filed its Proof of Claim in the Chapter 11 Cases against Holdings. It is attached hereto as Exhibit A.

44. The Proof of Claim and all allegations therein are incorporated and realleged by reference here.

45. The Proof of Claim alleges that although the Purchase Option lapsed without being exercised and Levona remained the sole owner of Gas's preferred shares, Holdings improperly interfered with Levona's management of Gas, resulting in hundreds of millions of dollars in injury to Levona.

46. The Proof of Claim also alleges, among other things, that Holdings prevented a financier from mortgaging five vessels, resulting in increased interest payments of approximately $550,000 per vessel per year; blocked the $262,000,000 sale of vessels to Unigas, as alleged above; and refused to turn over control of the *Symi* and *Telendos*.

47. Based on Holdings' misconduct, Levona asserted the following claims: (a) breach of the BOL and its related agreements; (b) breach of the LLCA; (c) fraud and fraudulent inducement in entering into the BOL and its related agreements; (d) breach of fiduciary duties; (e) refusal to attend board meetings, thereby blocking the opportunity to refinance two vessels; (f) violations of the Bankruptcy Court's Stay Relief Order and Automatic Stay and the arbitrator's

status quo injunction; (g) tortious interference with contract; (h) conversion; (i) refusal to turn over financial information; (j) malicious prosecution; (k) tortious interference with prospective business relations; (l) aiding and abetting the foregoing acts; and (m) conspiracy to commit the foregoing acts.

48. Levona sought damages in a to-be-determined amount, including all attorneys' fees, costs, expenses, losses, and other damages resulting from Holdings' misconduct, as well as punitive damages.

49. The Proof of Claim, which has now been pending for more than 2.5 years, has never been adjudicated.[4] By virtue of Sections 1.95, 5.10(b), and 7.6 of the Plan, the Proof of Claim remains viable.

### B. The Harm To Plaintiffs From Defendants' Refusal To Cede Control Of Gas Or Its Subsidiaries And Conversion Of Gas's Assets

50. Levona's claims have continued to accrue since it asserted its Counterclaim and Proof of Claim as various Defendants, including the Reed Smith Defendants and "[t]he principals of [the Purported Nominees,] continue to [improperly] exercise day to day control over [] Gas" and convert its assets. D. Ct. ECF 678, at 50.

51. The Reed Smith Defendants, who knew they had obtained the Award through wrongful means, were well aware that they would suffer potentially catastrophic consequences if their wrongdoing were ever revealed. They attempted to protect themselves from those consequences by engaging in a wrongful campaign to cover up their misconduct. Some of that misconduct is documented in Levona's pending sanctions motion in the District Court Proceedings (D. Ct. ECFs 681, 682), incorporated here, which addresses the Reed Smith Defendants'

---

[4] Holdings has asserted that it does not object to the Proof of Claim being adjudicated via this adversary proceeding.

misconduct during the confirmation and District Court Proceedings to cover up and further the arbitral misconduct.

52. More specifically, the Reed Smith Defendants' misconduct was part of a self-interested scheme to cover up their wrongdoing in the Arbitration and otherwise and thereby:

(i) insulate themselves against liability for the hundreds of millions of dollars of damages they caused;

(ii) evade accountability for their violations of the rules and requirements of professional responsibility applicable to lawyers;

(iii) avert the injury to their professional and personal reputations, and the associated monetary impact, that would follow if their wrongdoing were exposed;

(iv) secure a source of payment for the tens of millions in fees they are owed, by attempting to keep the Individual Defendants in control of Gas and its bank accounts;

(v) crystallize their purported entitlement to a multi-million dollar contingency fee for their "success" in obtaining and confirming the Award; and

(vi) capture future business and legal fees by benefitting the Individual Defendants and their families, who had been hiring Reed Smith and Weller on various matters for decades.

The Reed Smith Defendants' wrongful and self-interested actions thus went far beyond ordinary legal advice undertaken for the (purported) benefit of a client.

53. Moreover, Defendants persistently refused to turn over control of the *Symi* and *Telendos* to their new managers notwithstanding that on March 11, 2022, full control of the companies that own and control the vessels was transferred to Levona by means of the Share Transfer Agreement. As part of that misconduct, Defendants refused to change flags and provide Plaintiffs with requested information on the ships, and continued to direct the crew, who refused Plaintiffs' instructions to vacate. D. Ct. ECF 67-17 at 11, 14. Levona has spent money effectuating the management change and incurred costs and injury associated with delays for offhire periods and port fees.

54. Similarly, the Reed Smith Defendants wrongly maintained control of Gas, converted Gas's assets, and thwarted and circumvented the Plan, both directly and as agents, aiders-and-abettors, and co-conspirators with the other Defendants. That wrongdoing, like the other wrongdoing alleged above, was not in the nature of ordinary legal advice but rather was part of an independently wrongful effort by the Reed Smith Defendants to benefit themselves—an effort that included interference with the change of control of Gas for the purpose of, among other things, covering up the Reed Smith Defendants' misconduct and thereby evading the consequences of that misconduct; securing a source of payment for tens of millions of dollars in unpaid legal fees; and benefitting the Individual Defendants and their families, who were a decades-old source of business and an anticipated source of future business if they could retain control of the Eletson enterprise. Solomon made note of the connection on August 28, 2023, when he urged the Individual Defendants and outside Greek counsel to quickly settle all disputes so as to head off what he characterized as "my problems, to be candid," including that developments in the Chapter 11 Cases were "confounding the arbitration win. Alas." As further examples of wrongdoing to the same end, on November 21, 2024, the Reed Smith Defendants advised on improperly transferring the management of Gas's vessels; on December 19, 2024, they helped prevent Gas from taking possession of its property after the Plan had become effective; and in January and February 2025, they assisted in diverting Gas's funds to an incorrect bank account and wrongly asserting ownership and management of Gas's assets.

55. In this regard, communications discovered on Eletson's Microsoft server reveal that since at least early 2025 Defendants have been deliberately seeking to manufacture or precipitate alleged contractual defaults and to position third-party enforcement mechanisms as leverage, in a manner designed to strip vessels and other assets from Gas, to the detriment of Gas's rightful

owners and for the benefit of Defendants. The Reed Smith Defendants have been among the direct intended beneficiaries of this as their fees were paid using diverted assets. These communications reflect a coordinated effort to harm Gas's rightful owners and create the appearance of default-based remedies while insulating Defendants from accountability.

56. To start, on February 23, 2025, Weller emailed the Individual Defendants, Solomon, and several other Reed Smith lawyers to propose a scheme in which Eletson's lead financier "could theoretically go 'nuclear'" as to Eletson's fleet while falsely maintaining the appearance of impartiality so as to avoid the risk that its "hostile action could make them a … target for litigation." D. Ct. ECF 700-1 at 4. Solomon responded (by email, though he "prefer[red] a call") that the financier "must do something. It will NOT look like it is choosing sides. It will be protecting its own assets and income. Even just action on S/T [*Symi/Telendos* vessels] or the Houston vessel. I can't stress it enough." *Id.* at 2.

57. In furtherance of the proposed scheme, on March 9, 2025, Weller circulated an email titled "'Symi' + 'Telendos' – Economic consequences … of [financier's] termination of the BBCs [bare-boat charterers]." D. Ct. ECF 700-2, at 2. That email set out that following a default, the financier "may… transfer the ownership of the [*Symi*] to any third party" and noted that the financier "would also see Eletson [*i.e.,* the Purported Nominees and Former Principals] paid what they are due in respect of outstanding OPEX [operating expenses] (about US$1.6 m[illion] to date) which is otherwise currently disputed and not being paid." *Id.* at 2.

58. On March 26, 2025, Weller emailed the Former Principals that he had spoken with the relevant financier as part of a campaign to (wrongfully) "block [Levona's] purchase" of the *Symi*. D. Ct. ECF 700-3, at 3-4.

59. On May 11, 2025, Weller drafted an email for Hadjieleftheriadis to send to Gas's financier, wrongly declaring authority over Gas's vessels on behalf of the Purported Nominees. Five days later, in an email chain concerning Reed Smith's unpaid fees, a representative of the Former Principals told Reed Smith that the only way for Reed Smith to be paid was for it to continue to work to keep the Former Principals in (wrongful) control of Gas and its affiliates, in which event the Former Principals would be able to refinance Gas's vessels and pay Reed Smith using the proceeds. Reed Smith did not withdraw from its representation. To the contrary, Reed Smith indicated its agreement to the quid pro quo: When the Former Principals asked Reed Smith to take further action on their behalf and against the interests of Gas and the other Plaintiffs on June 6, 2025, Reed Smith agreed to do so on the condition that its outstanding fees be paid.

60. In furtherance of Defendants' effort to wrongfully exercise authority over Gas's ships, on June 2, 2025, the Former Principals engaged in communications reflecting a deliberate strategy to manufacture alleged contractual breaches and precipitate enforcement proceedings involving Gas's vessels, notwithstanding their lack of any lawful authority to direct Gas's affairs. D. Ct. ECF 700-4. Those communications reveal the Former Principals exploring mechanisms to provoke or capitalize on purported termination narratives, while seeking to ensure that any resulting action would "not look like [Eletson's financier] is choosing sides" but instead would be framed as merely "protecting its own assets and income." D. Ct. ECF 700-1, at 2. Rather than reflecting legitimate corporate decision-making, these communications underscore the Former Principals' continued misuse of unauthorized control to engineer outcomes adverse to Gas and its rightful owners, while attempting to cloak those outcomes in the appearance of third-party enforcement. The Reed Smith Defendants, on information and belief, architected, advised, assisted, and were otherwise complicit in that misconduct.

61. The effort to divert Gas's assets was not just hypothetical. For instance, on August 19, 2025, an escrow agreement was wrongfully executed by a financier, Kertsikoff, Karastamati, individuals purporting to represent EMC, and Reed Smith (among others) that allegedly resolved a dispute between EMC and Gas but in fact was meant to steal the *Symi* from Plaintiffs' fleet and, on information and belief, divert money to the Purported Nominees. D. Ct. ECF 700-5. Under that improper agreement, the financier paid $3,887,129.98 into a Reed Smith client account for the benefit of Defendants in exchange for the release of the *Symi* (which had been placed under arrest purportedly on the basis of unpaid management fees). *Id.* at 4. Of that money, $2,600,000 was to be released promptly to the Purported Nominees in their supposed capacity as representatives of EMC, and the balance ($1,287,129.98 plus interest) was to be released to EMC upon evidence of a change of the *Symi*'s technical manager and confirmation of a crew change. *Id.* at 7-8.

62. In carrying out all that misconduct, Defendants have spent over 1.5 years (and counting) "disregard[ing] and violat[ing] the orders of th[e] [Bankruptcy] [C]ourt that they simply did not like." D. Ct. ECF 678, at 55; *see, e.g.*, D. Ct. ECF 413, at 9 ("[T]he bankruptcy court held various former Eletson entities, including the former majority shareholders,[] the purported provisional board of Eletson, and [] Hadjieleftheriadis individually, in contempt for pursuing the Greek proceeding, and required those entities and individuals to affirmatively withdraw it, imposing per diem monetary sanctions of $5,000 per party per day, jointly and severally, until they did so.") (citing Bankr. ECF 1537); Bankr. ECF 1716 (increasing sanctions against Hadjieleftheriadis and others, and sanctioning Karastamati, for violating Court orders); Bankr. ECF 1759 (sanctioning the Purported Nominees for violations of the court's stay relief order); Bankr. ECF 1885 (sanctioning Kertsikoff and Karastamati for their involvement in the Purported Nominees' violations of Court orders). This Court also found that the Purported Nominees made

the "deliberate decision" to "disregard the Court['s] orders and their obligations under United States law." D. Ct. ECF 678, at 53.

63. Since February 2025, the Bankruptcy Court has repeatedly held the Purported Nominees, Individual Defendants, Former Majority Shareholders, and others in contempt and sanctioned them for violating Court orders, including the confirmation and consummation orders, for actions such as authorizing Gas to record the Purported Nominees' alleged ownership of Gas's preferred shares in Gas's share registry, removing the Levona-appointed Gas board members and appointing new directors, and executing a written consent authorizing any action to enforce the Award. Bankr. ECF 1885, at 5-6; *see, e.g.*, D. Ct. ECF 678, at 38; D. Ct. ECF 413, at 9; Bankr. ECFs 1495, 1537, 1716, 1759, 1836, 1840, 1862, 1874, 1885, 1932. The sanctioned parties, including the Former Principals, have not purged their contempt or paid the associated contempt sanctions. *See* D. Ct. ECF 678, at 38. This Court relatedly ordered the Purported Nominees and "their agents, servants, employees, attorneys; and any other persons who are in active concert or participation with [them], including [] Gas" to dismiss "foreign proceedings seeking to confirm and/or enforce the Award." D. Ct. ECF 407, at 1-2. More recently, this Court entered judgment against the Purported Nominees, quantifying several hundred thousand dollars of sanctions against them by virtue of their discovery misconduct in the District Court Proceedings. D. Ct. ECF 748.

64. Despite all that, "[t]he principals of [the Purported Nominees] [] continue to exercise day to day control over [] Gas (notwithstanding the provisions of the Confirmation Plan and the bankruptcy court's directives that deprive them of the right to that control)." D. Ct. ECF 678, at 50; *see* D. Ct. ECF 413, at 8 ("Notwithstanding [the Purported Nominees'] efforts at obfuscation, it is clear that functional day-to-day control over Gas is being exercised by [the

Purported Nominees] and/or their principals."); *id.* at 18-19 (describing the Purported Nominees' exertion of control over Gas in Greek and U.K. proceedings).

65. Defendants have also asserted that the findings in the Vacatur Decision have no bearing on the positions they took in the Arbitration—which Defendants have always known were wrongful—and hence to the management and ownership of Gas. For example, on January 19, 2026, just a week after the Vacatur Decision was issued, Weller, acting on behalf of either the non-existent Provisional Holdings or some other unspecified entity associated with the Individual Defendants, sent a letter to Gas's foreign counsel stating that this Court's "vacatur leaves the parties in no different position than they faced in July 2022"; that there is a "dispute over whether the buyout option was exercised and, if so, to whom the preferred shares transferred"; and that "[t]hose issues [decided in the Vacatur Decision] still need to be addressed and resolved in an appropriate forum." D. Ct. ECF 690-1, at 2.

66. Weller sent additional letters thereafter taking the same position, and Reed Smith has taken the same position in court filings it has made on its own behalf. On February 2, 2026, the Purported Nominees stated in a filing in this Court that the Vacatur Decision "does not resolve the parties' open disputes over ownership of the preferred Gas shares" and "the parties are left to litigate the underlying disputes over ownership of the preferred shares of [Gas] in a forum where jurisdiction exists." D. Ct. ECF 692, at 5, 15. They made those statements knowing that the Purchase Option was never exercised, that there was no "nomination," that the contrary findings in the Award were obtained by fraud, and hence that there is no basis for any "dispute" regarding the ownership of Gas's preferred shares.

67. Likewise, on February 4, 2026, Reed Smith stated in a filing in the Bankruptcy Court that "control of Gas remains in dispute between Levona … and the [Purported] Nominees"

and that this Court's findings in the Vacatur Decision "do not bind" Reed Smith. *Eletson Holdings, Inc. v. Kertsikoff*, No. 25-bk-01120 (Bankr. S.D.N.Y), ECF 68-1, at 21 n.5, 42. And on February 6, 2026, Weller not only wrongfully asserted control over Gas but actually threatened third parties on that basis and stated that Gas and EMC "intend[] to seek any and all remedies available in law or equity as a result of [the third parties' purported] unlawful actions." D. Ct. ECF 700-6, at 4.

68. Similar statements followed. On information and belief, the Reed Smith Defendants continue to extensively confer, collaborate, and conspire with the Individual Defendants, the Purported Nominees, and their respective counsel in an intentional effort to harm Gas, EMC, and Levona and benefit the Individual Defendants, the Purported Nominees, and the Reed Smith Defendants themselves. That conduct, which among other things directly violated the Reed Smith Defendants' fiduciary duties to Gas, has not ceased. To the contrary, it occurred both before and after the Plan's Effective Date and even after Holdings and Corp., acting through replacement counsel, supported vacatur of the Award.

69. In engaging in this misconduct, Defendants have deprived Plaintiffs of the benefit of Gas's fleet. For instance, Gas as the owner of the fleet, Levona as the preferred shareholder of Gas, and EMC as the ships' technical manager are entitled to hundreds of millions of dollars in chartering and other revenues generated by the fleet. Plaintiffs have not received that revenue because of Defendants' wrongdoing, including the misappropriation of that revenue by Defendants and the misappropriation of funds wrongfully funneled to Reed Smith with Reed Smith's knowledge.

70. Defendants by their misconduct have also (i) intentionally triggered defaults under financing agreements, depriving Gas of the valuable right to acquire certain ships from lenders, in a manner that has caused tens of millions of dollars in losses, including losses associated with

diminished vessel equity; (ii) caused massive losses to Gas's enterprise value; (iii) caused wrongful costs and fees, including tens of millions of dollars in proceedings all over the world such as the Arbitration, the District Court Proceedings, and the Chapter 11 Cases, plus related proceedings in the London Court of International Arbitration, the British Virgin Islands, the United Kingdom, Greece, the Southern District of Texas, Malaysia, and elsewhere; and (iv) caused Plaintiffs to incur massive commercial and reputational damages, including lost profits and harm to goodwill.

## CAUSES OF ACTION

### COUNT 1:
### Declaratory Judgment (Against All Defendants)

71. Plaintiffs repeat and incorporate the allegations in ¶¶ 1-70, including those in the Counterclaim and Proof of Claim, as if set forth fully herein.

72. Plaintiffs are entitled to a declaration that: (a) Levona owns and controls Gas's preferred shares and the *Telendos*; (b) no Defendant owns or controls Gas's preferred shares, the *Symi*, or the *Telendos*; (c) the Purported Nominees and Individual Defendants, and all of their respective affiliates, lack authority to control the operations of Gas, its subsidiaries, the *Symi*, or the *Telendos*; (d) Gas validly terminated Reed Smith's representation (to the extent it existed) of it no later than November 2025; (e) the Reed Smith Defendants lack authority to represent Gas, EMC, or their respective subsidiaries anywhere in the world; (f) Defendants have no right to act as officers, managers, agents, counsel, or shareholders of Gas; (g) the Purchase Option was not exercised; and (h) the Purported Nominees were not nominated to receive the preferred shares of Gas.

### COUNT 2:
### Conversion & Replevin (Against All Defendants)

73. Plaintiffs repeat and incorporate the allegations in ¶¶ 1-72, including those in the Counterclaim and Proof of Claim, as if set forth fully herein.

74. Levona has a complete possessory right and interest in the preferred shares of Gas; Plaintiffs have a complete possessory right and interest in the past and present revenue of and equity in Gas's fleet; and Plaintiffs have a complete possessory right and interest in Gas's and EMC's assets and property including the $3,887,129.98 paid into a Reed Smith escrow account in August 2025, as alleged above.

75. Plaintiffs' right of possession of the foregoing assets and property is superior to Defendants'.

76. In derogation of Plaintiffs' rights, Defendants are wrongly exercising dominion over and interfering with Plaintiffs' exercise of their rights as owners of the foregoing assets and property.

77. Defendants refuse to turn over control of the foregoing assets and property.

78. Plaintiffs are entitled to an order requiring the foregoing assets and property to be returned to their possession.

79. From early 2022 until in or around February 2026, Levona had a complete possessory right and interest in the *Symi*.

80. In derogation of that right, Defendants wrongly exercised dominion over the *Symi* and converted it to their own use and benefit, interfering with Levona's exercise of its rights as owner of the *Symi*.

81. Levona suffered damages as a consequence of Defendants' conversion of the *Symi*.

82. Defendants intentionally, knowingly, and substantially aided and abetted, conspired with, and acted as agents of one another in converting the foregoing assets and property, including because the Reed Smith Defendants pursued the wrongful Arbitration and subsequent

proceedings that assisted Holdings, Corp., and the Individual Defendants in exercising wrongful dominion over the ships, shares, equity, and revenue of Gas.

83. The Purported Nominees and Individual Defendants are alter egos of one another, and were alter egos of Holdings and Corp. prior to the Effective Date of the Plan, and therefore are liable for one another's conduct to the extent of those alter ego relationships, including by piercing the corporate veil.

84. The Purported Nominees are vicariously liable for the wrongdoing of the Individual Defendants.

**COUNT 3:**
**Breach Of Contract (Against The Non-Reed Smith Defendants)**

85. Plaintiffs repeat and incorporate the allegations in ¶¶ 1-84, including those in the Counterclaim and Proof of Claim, as if set forth fully herein.

86. Gas's LLCA, as amended, is a valid and binding agreement between Levona, Holdings, and Corp.

87. The Fundamental Action Letter ("FAL") signed on March 11, 2022, is a valid and binding agreement between Levona, Gas, Holdings, and Corp.

88. The BOL is a valid and binding agreement between Levona, Gas, Holdings, EMC, and Corp.

89. Plaintiffs timely and fully performed all of their obligations under the LLCA, FAL, and BOL and satisfied any and all conditions precedent to the recovery of damages thereunder.

90. Holdings and Corp. materially breached the LLCA, FAL, and BOL—including the implied covenant of good faith and fair dealing implied in each of those contracts—through their, for example, mismanagement of Gas; refusal to abide by Levona's rights as Gas's preferred shareholder; and interference with Levona's rights as Gas's preferred shareholder, including by

sabotaging the Unigas transaction, refusing to turn over the *Symi* and *Telendos*, and pursuing the wrongful Arbitration and District Court Proceedings by lying to the arbitrator and this Court and concealing relevant evidence.

91. Holdings and Corp. have no excuse for their breaches of contract.

92. Because of the breaches of the LLCA, BOL, and FAL by Holdings and Corp., Plaintiffs have suffered injury.

93. The Individual Defendants and Purported Nominees are alter egos of one another, and were alter egos of Holdings and Corp. prior to the Effective Date of the Plan, and therefore are liable for one another's conduct to the extent of those alter ego relationships, including by piercing the corporate veil.

94. The Purported Nominees are vicariously liable for the wrongdoing of the Individual Defendants.

**COUNT 4:**
**Tortious Interference With Contract (Against The Individual Defendants, Purported Nominees, and Reed Smith Defendants)**

95. Plaintiffs repeat and incorporate the allegations in ¶¶ 1-94, including those in the Counterclaim and Proof of Claim, as if set forth fully herein.

96. The LLCA is a valid and binding agreement between Levona, Holdings, and Corp.

97. The FAL is a valid and binding agreement between Levona, Gas, Holdings, and Corp.

98. The BOL is a valid and binding agreement between Levona, Gas, Holdings, EMC, and Corp.

99. Defendants had knowledge of the LLCA, FAL, and BOL.

100. The Individual Defendants, Purported Nominees, and Reed Smith Defendants intentionally and without justification induced and helped Holdings and Corp. to breach their

obligations under the LLCA, FAL, and BOL—including the covenant of good faith and fair dealing implied in each of those contracts—through their independently tortious, self-serving, and actionable conduct, as set out above, such as lying to the arbitrator and this Court and concealing relevant evidence, which, as an example, denied Levona its contractual right to a legitimate and good-faith arbitration of the claims and counterclaims in the Arbitration.

101. The foregoing tortious interference caused Plaintiffs harm.

102. The Individual Defendants and Purported Nominees intentionally, knowingly, and substantially aided, abetted, conspired with, and acted as agents of Holdings, Corp., the Reed Smith Defendants, and one another in breaching obligations under the LLCA, FAL, and BOL as set out above, including by wrongfully procuring the Award and interfering with Levona's ownership and control of Gas through misconduct.

103. The Reed Smith Defendants intentionally, knowingly, and substantially aided, abetted, and conspired with all other Defendants and one another in breaching obligations under the LLCA, FAL, and BOL as set out above, including by wrongfully procuring the Award and interfering with Levona's ownership and control of Gas through misconduct outside the scope of any authority as counsel or agent they may have had.

104. The Individual Defendants and Purported Nominees are alter egos of one another, and were alter egos of Holdings and Corp. prior to the Effective Date of the Plan, and therefore are liable for one another's conduct to the extent of those alter ego relationships, including by piercing the corporate veil.

105. The Purported Nominees are vicariously liable for the wrongdoing of the Individual Defendants.

**COUNT 5:**
**Tortious Interference With Prospective Business Relationship (Against All Defendants)**

106. Plaintiffs repeat and incorporate the allegations in ¶¶ 1-105, including those in the Counterclaim and Proof of Claim, as if set forth fully herein.

107. Defendants tortiously interfered with Plaintiffs' prospective business relationships through dishonest, unfair, or improper means, including by denying Plaintiffs the opportunity to refinance and/or purchase Gas's vessels; interfering with Plaintiffs' rights to manage the vessels; interfering with the sale of the *Symi* and *Telendos*; wrongfully obtaining a worldwide freezing order from a court in the British Virgin Islands thus severely restricting Levona's ability to operate; and blocking the Unigas transaction. Defendants engaged in all this conduct through communications to third parties including Unigas, the arbitrator, this Court, and the Bankruptcy Court.

108. Because of those actions, Plaintiffs' business relationships were injured and Plaintiffs suffered injury, including as set out in Levona's Arbitration Counterclaim and Proof of Claim.

109. Defendants intentionally, knowingly, and substantially aided, abetted, conspired with, and acted as agents of one another in connection with the foregoing misconduct, including through dishonest, unfair, or improper means.

110. The Purported Nominees and Individual Defendants are alter egos of one another, and were alter egos of Holdings and Corp. prior to the Effective Date of the Plan, and therefore are liable for one another's conduct to the extent of those alter ego relationships, including by piercing the corporate veil.

111. The Purported Nominees are vicariously liable for the wrongdoing of the Individual Defendants.

**COUNT 6:**
**Breach Of Fiduciary Duty (Against Holdings, Corp., The Individual Defendants, And The Reed Smith Defendants)**

112. Plaintiffs repeat and incorporate the allegations in ¶¶ 1-111, including those in the Counterclaim and Proof of Claim, as if set forth fully herein.

113. Holdings and Corp. owed fiduciary duties of loyalty and care to Gas and Gas's members, including Levona.

114. Holdings and Corp. breached their fiduciary duties of loyalty and care to Gas and Levona, including by bringing and prosecuting the wrongful Arbitration, mismanaging Gas, and acting for the benefit of the Purported Nominees and Individual Defendants rather than Gas. They did so intentionally, in bad faith, and willfully.

115. The Reed Smith Defendants owed fiduciary duties of care and loyalty to Gas. The Reed Smith Defendants acted as Gas's attorney during the Arbitration and the District Court Proceedings or were in near privity with Gas during the Arbitration and the District Court Proceedings, including because they made a clear commitment to undertake the specific task of obtaining, confirming, and defending the Award for the purported benefit of Gas; conducted themselves in the Arbitration and the District Court Proceedings as attorneys of Gas; provided legal advice, services, or assistance to the Individual Defendants and others who had (wrongful) control of Gas during the Arbitration and the District Court Proceedings; and asserted privilege purportedly on behalf of Gas in the District Court Proceedings for communications that occurred during the Arbitration.

116. The Reed Smith Defendants breached those duties of care and loyalty by acting against Gas's interests, including by prosecuting the wrongful Arbitration as alleged above, acting for the benefit of the Purported Nominees and Individual Defendants rather than Gas, and providing the escrow accounts that the Individual Defendants used to convert the $3,887,129.98

in funds that were contractually owed to Gas or its subsidiaries. They did so intentionally, in bad faith, willfully, and to benefit themselves.

117. The Individual Defendants were at various times actual or purported officers and directors of Gas and EMC, and thus owed duties of care and loyalty to Gas and EMC.

118. The Individual Defendants breached those duties by acting for the benefit of the Purported Nominees and themselves, rather than Gas and EMC.

119. Defendants' breaches of fiduciary duties caused Plaintiffs harm, including lost funds, reputational injury, lost corporate control, and lost profits, and resulted in Defendants' unjust enrichment.

120. Defendants intentionally, knowingly, and substantially aided, abetted, conspired with, and acted as agents of one another in connection with the foregoing breaches of fiduciary duty.

121. The Purported Nominees and Individual Defendants are alter egos of one another, and were alter egos of Holdings and Corp. prior to the Effective Date of the Plan, and therefore are liable for one another's conduct to the extent of those alter ego relationships, including by piercing the corporate veil.

122. The Purported Nominees are vicariously liable for the wrongdoing of the Individual Defendants.

**COUNT 7:**
**Legal Malpractice (Against The Reed Smith Defendants)**

123. Plaintiffs repeat and incorporate the allegations in ¶¶ 1-122, including those in the Counterclaim and Proof of Claim, as if set forth fully herein.

124. As alleged above, the Reed Smith Defendants acted as Gas's attorney in the Arbitration and District Court Proceedings or were in near privity with Gas in the Arbitration and District Court Proceedings.

125. In acting as Gas's attorney or in near privity with Gas, the Reed Smith Defendants failed to exercise the degree of care, skill, and diligence commonly possessed and exercised by an ordinary member of the legal community.

126. Additionally, the Reed Smith Defendants are liable to all Plaintiffs, regardless of privity, because their malpractice was committed in the presence of fraud, collusion, malicious acts or other special circumstances, as alleged above and including the Reed Smith Defendants' own wrongdoing.

127. As a result of the foregoing misconduct, Plaintiffs have suffered damages including, without limitation, lost funds, reputational injury, lost corporate control, and lost profits, and Defendants have been unjustly enriched.

**COUNT 8:**
**New York Judiciary Law § 487 (Against The Reed Smith Defendants)**

128. Plaintiffs repeat and incorporate the allegations in ¶¶ 1-127, including those in the Counterclaim and Proof of Claim, as if set forth fully herein.

129. The Reed Smith Defendants engaged in deceit and collusion with intent to deceive this Court, the Bankruptcy Court, and Levona, crossing the "important line between aggressive advocacy and false statements" (D. Ct. ECF 678 at 125-28), including by making knowingly false assertions that the Purchase Option had been exercised, peddling what this Court found is "the fabricated backstory" about the nomination of the Purported Nominees, making "patently untrue" statements about withheld evidence, pursuing confirmation and opposing vacatur of the wrongful

Award, and making false statements in an effort to cover up their misconduct and oppose the disclosure of relevant evidence. D. Ct. ECF 678, at 34, 113, 125-26.

130. By all the above-stated conduct, the Reed Smith Defendants engaged in and/or consented to deceit or collusion with intent to deceive the courts and Levona in a manner that intentionally inflicted harm on Plaintiffs.

**PRAYER FOR RELIEF**

131. For the above conduct, Plaintiffs seek:

a. A declaration that Levona owns and controls Gas's preferred shares and the *Telendos*; no Defendant owns or controls Gas's preferred shares, the *Symi*, or the *Telendos*; the Purported Nominees and Individual Defendants, and all of their respective affiliates, lack authority to control the operations of Gas, its subsidiaries, the *Symi*, or the *Telendos*; Gas validly terminated Reed Smith's representation (to the extent it existed) of it no later than November 2025; the Reed Smith Defendants lack authority to represent Gas, EMC, or their respective subsidiaries anywhere in the world; Defendants have no right to act as officers, managers, agents, counsel, or shareholders of Gas; the Purchase Option was not exercised; and the Purported Nominees were not nominated to receive the preferred shares of Gas.

b. Turnover of the benefit of Gas's preferred shares, including control of the assets, property, and operations of Gas and EMC; and turnover of the funds that were deposited in a Reed Smith escrow account as alleged above;

c. Damages in an amount to be determined at trial but not less than $600 million;

d. Punitive damages in an amount to be determined at trial;

e. Treble damages;

f. Disgorgement of all property that Defendants unlawfully gained and as to which they have been unjustly enriched;

g. Forfeiture of all fees and income received by the Reed Smith Defendants and the Individual Defendants during the period of their disloyalty;

h. Interest on all damages as permitted by law; and

i. Such other and further relief as the Court may deem appropriate.

DATED: July 24, 2026
New York, New York

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By /s/ Isaac Nesser

Isaac Nesser
William B. Adams
Daniel M. Kelly
295 Fifth Avenue
New York, NY 10016
Tel: 212-849-7253
isaacnesser@quinnemanuel.com
williamadams@quinnemanuel.com
danielkelly@quinnemanuel.com

Matthew Scheck
Matthew Roznovak (pro hac vice forthcoming)
Alexander Van Dyke (pro hac vice forthcoming)
300 W. 6th Street
Austin, TX 78701
Tel: 737-667-6100
matthewscheck@quinnemanuel.com
matthewroznovak@quinnemanuel.com
alexvandyke@quinnemanuel.com

*Attorneys for Plaintiffs*